760 So.2d 650 (2000)
Rodney HENDRICK
v.
ABC INSURANCE COMPANY, DEF Insurance Company, XYZ Insurance Company, et al. (Two Cases)
Nos. 97 CA 0546, 99 CA 0875.
Court of Appeal of Louisiana, First Circuit.
May 12, 2000.
Rehearing Denied July 7, 2000.
*652 John M. Wilson, Cheryl V. Cunningham, James A. Brown, Dena L. Olivier, New Orleans, for Defendants-Appellants Stone, Pigman, Walther, Wittmann & Hutchinson, et al.
Robert R. Percy, III, James C. Percy, Timothy E. Pujol, Gonzales, for Plaintiff-Appellee Rodney Hendrick.
Before: FOIL, GONZALES, FOGG, KUHN, and GUIDRY, JJ.
GUIDRY, J.
In this legal malpractice action, appellants, Stone, Pigman, Walther, Wittman & Hutchinson, John M. Landis, Randall A. Smith, William E. Brown, and Attorneys' Liability Assurance Society, Inc. (hereinafter, collectively "Stone, Pigman"), and *653 plaintiff, Rodney Hendrick (hereinafter "Hendrick"), appeal two trial court decisions. First, Stone, Pigman challenges the trial court's judgment of January 22, 1996, finding Stone, Pigman liable to Hendrick in the amount $2,867,547.00, plus interest, as damages for legal malpractice. Additionally, Stone, Pigman asserts that the trial court erroneously held, in its November 18, 1998 judgment, that La. R.S. 9:5605, as enacted in 1990 and amended in 1992, is constitutional but inapplicable to Hendrick's claims. We affirm in part, reverse in part and render.

BACKGROUND INFORMATION
This court summarized the facts of this case previously on appeal of another issue as follows:
The underlying facts in this case are somewhat convoluted. Plaintiff, Rodney Hendrick, was represented in bankruptcy proceedings in bankruptcy court by William E. Steffes. Defendant, David Rubin, represented the bankruptcy trustee. On February 13, 1985, the bankruptcy judge granted an order authorizing a sale of stock which had been owned jointly by Hendrick and his exwife. The sale was contested by Hendrick. At the hearing, the trustee expressed reservations as to the sale, and the bankruptcy judge instructed him to investigate possible fraud on the part of the buyers and to bring an action, if warranted, to recover claims on the part of the bankruptcy estate. However, the order authorizing the sale was signed and no such reservation of rights was incorporated, although the minute entry reflects the bankruptcy judge's instructions. No appeal was taken from that order.
On April 29, 1985, Stone, Pigman was appointed as special counsel to the bank-ruptcy trustee to investigate possible fraud in the stock sale.[1] Depositions were taken on November 18 and 19, 1985, and on January 23 and 24, 1986, which revealed fraud forming the basis for a subsequent RICO action filed by Stone, Pigman on February 12, 1986, against the purchasers of the stock. On October 26, 1987, Hendrick's bankruptcy proceedings were terminated and Steffes' representation ceased; on January 1, 1987, Hendrick had retained Stone, Pigman personally.
In September of 1987, Stone, Pigman learned that defendants in the RICO action intended to raise defenses of res judicata and collateral estoppel based on Hendrick's failure to appeal the February 13, 1985 order authorizing the stock sale, and realized shortly thereafter the discrepancy between the minute entry and the order which authorized the sale. On January 26, 1989, the United States District Court rendered a decision granting defendants' motion for summary judgment, finding res judicata and collateral estoppel were applicable because there was no appeal from the order authorizing the stock sale. The United States Fifth Circuit Court of Appeals affirmed, and on October 1, 1990, the United States Supreme Court denied writs.
On January 10, 1991, Hendrick filed the instant malpractice action naming Steffes, Rubin, and Stone, Pigman as defendants. On April 15, 1994, a hearing was held on exceptions of prescription filed by Steffes and Rubin against Hendrick in the main demand and against Stone, Pigman on its cross-claim *654 for contribution and indemnity. On April 26, 1994, the trial court signed a judgment dismissing Steffes and Rubin from the main demand, and on June 17, 1994, the judgment dismissing Stone, Pigman's cross-claims on the basis of prescription was signed.
Hendrick v. Stone, Pigman, Walther, Wittmann & Hutchinson (Hendrick I), 95-1577, pp. 2-3 (La.App. 1st Cir.6/28/96), 677 So.2d 716, 718, writs denied, 96-2013 and 96-2136 (La.11/8/96), 683 So.2d 271, 272 (footnote added). Stone, Pigman appealed, and this court, in Hendrick I, reversed the dismissal of Steffes on the basis of prescription, but rendered a judgment sustaining Steffes' exception of res judicata and dismissing Stone, Pigman's cross-claim against him. Stone, Pigman applied to the Louisiana Supreme Court for writ of certiorari, which was denied on November 8, 1996. Hendrick v. Stone, Pigman, Walther, Wittmann & Hutchinson, 96-2136 (La.11/8/96), 683 So.2d 272.
A bench trial on the merits of Hendrick's claim against Stone, Pigman was held February 14-16 and 20-22, 1995, and the matter was taken under advisement. A judgment in favor of Hendrick and against Stone, Pigman was rendered in open court on December 29, 1995, and signed on January 22, 1996. Thereafter, Stone, Pigman petitioned the trial court for the grant of an appeal, and the appeal was granted by order dated February 13, 1996. Hendrick answered the appeal.
While the appeal was pending, the Louisiana Supreme Court decided the case of Reeder v. North, 97-0239 (La.10/21/97), 701 So.2d 1291, which Hendrick believed directly impacted the outcome of this case. Therefore, Hendrick filed a motion for stay of appeal and for remand to the trial court to allow him an opportunity to amend his petition to assert and argue the unconstitutionality of retroactively applying La. R.S. 9:5605 to Hendrick's claim. The motion was granted on February 19, 1998, and the case was remanded to the trial court.[2]
Thereafter, Hendrick filed a fourth supplemental and amending petition in the trial court, asserting that the retroactive application of La. R.S. 9:5605 to Hendrick's claim is an unconstitutional violation of the Fifth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 2, 22 and 23 of the Louisiana Constitution. Stone, Pigman filed exceptions, affirmative defenses and answers to this fourth supplemental and amended petition. A hearing on the petition was held on September 8, 1998, and a judgment denying Stone, Pigman's exceptions, and declaring La. R.S. 9:5605 constitutional but inapplicable to appellee's claim was rendered on November 10, 1998, and signed November 18, 1998. This appeal followed.

ASSIGNMENTS OF ERROR
The parties have asserted numerous assignments of error. In the first appeal, Stone, Pigman averred the following assignments of error:
1. The district court erred as a matter of law in holding [Stone, Pigman] liable to the plaintiff, a separately represented non-client with whom [Stone, Pigman] had no attorney-client relationship at the time of or with respect to the matters relevant to the plaintiff's claims.
2. The district court erred as a matter of law and fact in holding [Stone, Pigman] absolutely liable for the errors of previous counsel with respect to matters outside the scope of [Stone, Pigman's] retention, when they were not hired to, and had no reason or cause to, question the previous attorneys' work.
3. The district court erred as a matter of law in refusing to dismiss the plaintiff's *655 suit on the ground that it is perempted under La. R.S. 9:5605 because the plaintiff failed to file suit within one year of discovering the factual basis and alleged grounds of his malpractice claims.
4. The district court erred as a matter of law in failing to dismiss the plaintiffs suit on the ground that the underlying remedy of which he claimed to have been deprived, an extraordinary collateral attack upon a final and definitive judgment under Federal Rule of Civil Procedure ("Rule") 60(b)(3), would have failed as a matter of law.
5. The district court erred as a matter of law in binding [Stone, Pigman] in this malpractice case to contentions made in pleadings filed by them on the plaintiffs behalf while zealously advocating his case in the underlying suit in accordance with their legal and ethical obligations as his counsel.
6. The district court erred as a matter of law in admitting and crediting rank hearsay, consisting of deposition excerpts and unauthenticated documents from other proceedings to which [Stone, Pigman] were not parties, as purported "proof" of the merits of the plaintiffs underlying Rule 60(b) remedy.
7. The district court erred as a matter of law and fact and abused its discretion in awarding the plaintiff a grossly excessive measure of damages based upon speculative and implausible assumptions and theories, when the plaintiff failed to prove any damages, and when the reliable, contemporaneous financial information and other record evidence plainly showed that the plaintiff suffered no damage, or, at worst, only nominal damage.
8. The district court erred as a matter of law in failing to apportion percentages of fault to the parties and counsel responsible for the procedural deficiency giving rise to this case, and in failing to reduce the judgment against [Stone, Pigman] accordingly.
9. The district court erred as a matter of law in denying [Stone, Pigman's] judgment on their reconventional demand against plaintiff in the amount of $60,355.72 for out-of-pocket costs and expenses owed by the plaintiff under his contingency fee contract with [Stone, Pigman], with legal interest from the due date of each invoice.
Hendrick answered the first appeal, asserting the following as error:
1. The district court erred as a matter of law in declining to award plaintiff treble his damages as required under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1961, et seq. (R.I.C.O.)
2. The district court erred as a matter of law by failing to award plaintiff the value of his lost stock at the time of trial in the underlying action.
3. The district court erred as a matter of law by failing to award to plaintiff the legal interest he would have been awarded in a judgment in the underlying action.
In the second appeal, Hendrick raises the following assignment of error:
1. In the event that it is determined that La. R.S. 9:5605 is to be given retroactive effect to divest [Hendrick] of his timely filed claim, then the trial court erred in failing or refusing to find the statute unconstitutional.
In its cross-appeal, Stone, Pigman asserts the following:
1. The district court erred as a matter of law in finding La. R.S. 9:5605 inapplicable to Hendrick's legal malpractice claims in this suit, given that his claims arose in 1985, he discovered the factual basis and alleged grounds of his claims in 1988, but did not file the instant suit until January 1991.
2. The district court erred as a matter of law in failing to find that La. R.S. 9:5605, as written and applied to Hendrick's claims, comports with the Louisiana *656 and United States Constitutions, given that Hendrick had one year from the date he was advised of the factual basis and grounds of his claims within which to file this suit.
We address these assignments of error in the order of their importance to the outcome of the case.

DISCUSSION

Abandonment of Constitutional Challenge
On appeal, Stone, Pigman asserts that this court erroneously remanded this case to the trial court and allowed Hendrick to amend his petition to challenge the constitutionality of La. R.S. 9:5605. We disagree. "[T]he law takes a liberal approach toward allowing amended pleadings in order to promote the interests of justice.... `[I]f the new allegations raise the possibility that the claim is not prescribed, even if the ultimate outcome of the prescription issue, once the petition is amended, is uncertain,' then opportunity to amend should be allowed." Reeder v. North, 97-0239, p. 15 (La.10/21/97), 701 So.2d 1291, 1299. Therefore, it was not error for this court to, in the interest of justice, remand this case to allow Hendrick to assert his constitutional challenge and for a determination of the constitutional question by the trial court.

Constitutional Questions
In his appeal, Hendrick asserts that if La. R.S. 9:5605 is applicable to his case, then La. R.S. 9:5605 is unconstitutional. We, however, do not reach or determine this issue of the constitutionality of La. R.S. 9:5605.
A court should not reach or determine constitutional issues unless, in the context of a particular case, the resolution of such issues is necessary to decide the case. Brinker v. Junction City Wood Company, Inc., 96-2896, pp. 3-4 (La.1/20/99), 728 So.2d 1252, 1254. No rule of practice is better settled than "never to anticipate a question of constitutional law in advance of the necessity of deciding it." Matherne v. Gray Insurance Company, 95-0975, p. 3 (La.10/16/95), 661 So.2d 432, 434. It is a long standing judicial principle that courts will not consider constitutional challenges unless necessary to the resolution of a dispute. Brinker, 96-2896 at 4, 728 So.2d at 1254. Hence, courts should avoid constitutional rulings when the case can be disposed of on the basis of nonconstitutional issues. Louisiana Associated General Contractors, Inc. v. New Orleans Aviation Board, 97-0752, p. 5 (La.10/31/97), 701 So.2d 130, 132.
In the present case, we need not reach the constitutional question because it is unnecessary to the resolution of this case. Since we determine in the following section that La. R.S. 9:5605 is inapplicable to the present case, the case can be disposed of on the basis of nonconstitutional issues. Thus, we save the constitutional analysis of La. R.S. 9:5605 for another day.

Applicable Law of Prescription
On or about February 13, 1985, when the bankruptcy court issued the approval order for the stock sale without the intended reservation of the trustee's rights to investigate the underlying transaction and assert any claims related to it, the prescriptive period for legal malpractice claims was governed by La. C.C. art. 3492, which provides that "[d]elictual actions are subject to a liberative prescription of one year." This prescriptive period commences to run from the day injury or damage is sustained. Reeder, 97-0239 at 4, 701 So.2d at 1294. However, today the time limits to file legal malpractice actions are contained in La. R .S. 9:5605, enacted in 1990 and amended in 1992, which provides in pertinent part:
A. No action for damages against any attorney at law duly admitted to practice in this state, any partnership of such attorneys at law, or any professional corporation, company, organization, association, enterprise, or other commercial *657 business or professional combination authorized by the laws of this state to engage in the practice of law, whether based upon tort, or breach of contract, or otherwise, arising out of an engagement to provide legal services shall be brought unless filed in a court of competent jurisdiction and proper venue within one year from the date of the alleged act, omission, or neglect, or within one year from the date that the alleged act, omission, or neglect is discovered or should have been discovered; however, even as to actions filed within one year from the date of such discovery, in all events such actions shall be filed at the latest within three years from the date of the alleged act, omission, or neglect.
B. The provisions of this Section are remedial and apply to all causes of action without regard to the date when the alleged act, omission, or neglect occurred. However, with respect to any alleged act, omission, or neglect occurring prior to September 7, 1990, actions must, in all events, be filed in a court of competent jurisdiction and proper venue on or before September 7, 1993, without regard to the date of discovery of the alleged act, omission, or neglect. The one-year and three-year periods of limitation provided in Subsection A of this Section are peremptive periods within the meaning of Civil Code Article 3458 and, in accordance with Civil Code Article 3461, may not be renounced, interrupted, or suspended.
C. Notwithstanding any other law to the contrary, in all actions brought in this state against any attorney at law duly admitted to practice in this state, any partnership of such attorneys at law, or any professional law corporation, company, organization, association, enterprise, or other commercial business or professional combination authorized by the laws of this state to engage in the practice of law, the prescriptive and peremptive period shall be governed exclusively by this Section.
On appeal, Stone, Pigman asserts that the district court erred, as a matter of law, in finding La. R.S. 9:5605 inapplicable to Hendrick's legal malpractice claim.
Although Reeder is factually similar to this case, there are certain distinguishing facts that make its holding inapplicable to this case. William Reeder, Jr., filed a legal malpractice action on September 15, 1994, against Bruce A. North in connection with North's failure to assert claims in a suit filed by North on behalf of Reeder on July 10, 1989, in federal court. After the federal suit was dismissed, North filed a state court action on behalf of Reeder asserting the same claims from the federal action and also the claims that were not asserted in the federal claim. The entire state court action was dismissed, including the newly asserted claims, as barred by res judicata. Although the appellate court reversed the dismissal of the newly asserted claims, the Louisiana Supreme Court reversed, holding that because the federal court had pendant jurisdiction over all of Reeder's state law claims, the federal judgment precluded the omitted state law claims as well. Thereafter, the United States Supreme Court denied certiorari.
In response to Reeder's legal malpractice petition, North filed an exception on the basis that La. R.S. 9:5605 perempted the malpractice action. The exception was granted. On appeal, the Fifth Circuit Court of Appeal reversed and remanded for trial on the merits. North sought writs, which the supreme court granted to address the questions of (1) whether "the appellate court ignored the express provisions of La. R.S. 9:5605 that the peremptive period cannot be renounced, interrupted, or suspended by applying a rule of suspension; and (2) [whether] the appellate court erroneously held that the three-year peremptive period commences only when a cause of action has accrued, rather than on the date of the act, omission or neglect." Reeder, 97-0239 at 4, 701 So.2d at 1294.
*658 The supreme court concluded that La. R.S. 9:5605 was applicable and that pursuant to the "particularly clear" language of the statute, Reeder's September 15, 1994 suit was untimely filed.[3] The court, however, did not address the constitutional questions of whether the retroactive application of the statute to his claim was an unconstitutional divestiture of his vested property right and whether the statute is an unconstitutional violation of the open courts doctrine of La. Const. art. I, § 22 because Reeder had not specifically pled the constitutional issues at the trial court. Therefore, the case was remanded to the trial court to allow Reeder to amend his petition.
We think, however, that Reeder is of noteworthy consequence at this juncture for its distinguishing aspects that make Reeder inapplicable to the present case. The court of appeal, in Reeder, had previously determined that under Lima v. Schmidt, 595 So.2d 624 (La.1992), Reeder's claim against North was suspended during the period in which North continued to represent Reeder in the state court action. The supreme court, nevertheless, determined that the continuous representation rule of Lima was inapplicable to Reeder's claim because "[b]oth the negligent act occurred and the malpractice suit was filed prior to the enactment of La. R.S. 9:5605 in 1990, so this Court applied the one-year prescriptive period of La. C.C. art. 3492. Because Civil Code Article 3492 is a prescriptive period, th[e supreme c]ourt held that the period was suspended `during the attorney's continuous representation of the client regarding the specific subject matter in which the alleged wrongful act or omission occurred."' Reeder, 97-0239 at 11, 701 So.2d at 1297 (boldface and underscoring added).
The present case, we believe, while not on all fours with Lima, is more factually analogous to that case than it is to Reeder. In this case, as in Lima (and Reeder), the negligent act giving rise to the malpractice claim occurred prior to the enactment of La. R.S. 9:5605. And while the plaintiff's suit in Reeder was brought after the statute, as amended, but outside the grace period, the suit in the present case was filed in 1991, the time period during which the statute lacked the necessary saving grace period.
A statute of limitation is remedial in nature and, generally, applies to all actions instituted after its effective date even though the cause of action accrues before the statute was enacted. Marsh Engineering, Inc. v. Parker, 94-1129, p. 7 (La.App. 3rd Cir.5/8/96), 688 So.2d 1042, 1046, writ denied, 96-1434 (La.9/27/96), 680 So.2d 637. However, statutes of limitation, like any other procedural or remedial law, cannot consistently with state and federal constitutions apply retroactively to disturb a person of a pre-existing right. Lott v. Haley, 370 So.2d 521, 523-24 (La. 1979). Such divestiture offends "due process" guaranteed by both the State and the United States Constitutions. Marsh Engineering, Inc., 94-1129 at 7-8, 688 So.2d at 1046. Nevertheless, as stated by the supreme court in Lott, 370 So.2d at 524:
[A] newly-created statute of limitation or one which shortens existing periods of limitation will not violate the constitutional prohibition against divesting a vested right provided it allows a reasonable time for those affected by the act to assert their rights. Cooper v. Lykes, 218 La. 251, 49 So.2d 3 (1950); State v. Recorder of Mortgages, 186 La. 661, 173 So. 139 (1937). Moreover, the legislature is the judge of the reasonableness of the time and the courts will not interfere except where the time is so short as *659 to amount to a denial of justice. Cooper v. Lykes, supra. Finally, where an injury has occurred for which the injured party has a cause of action, such cause of action is a vested property right which is protected by the guarantee of due process.
As previously stated, the 1990 enactment of La. R.S. 9:5605 contained no grace period, reasonable or otherwise, for those affected by the act to assert their rights. And even though the statute was amended in 1992, to add such a grace period, we cannot say that the 1992 enactment evidenced legislative intent that a grace period be included in the 1990 enactment. When the language of a statute is clear and unambiguous, as was the language of the 1990 statute, this court is not free to go in search of the legislative intent; we must apply the law as written. La. C.C. art. 9; La. R.S. 1:4; Marsh Engineering, Inc., 94-1129 at 9-10, 688 So.2d at 1047.
We believe the reasoning employed by the supreme court in Maltby v. Gauthier, 506 So.2d 1190 (La.1987), involving La. R.S. 9:5628,[4] the prescription article for medical malpractice claims, applies in this case. According to Maltby,
Although the Legislature could have done so, the enactment of R.S. 9:5628 did not expressly provide either for a delay in the effectiveness of the statute,..., or for a grace period for persons with vested claims to assert their rights. Either type of provision arguably would have indicated a legislative intent for the statute to apply to vested causes of action, and the remaining question for the court would have been whether the period provided was a reasonable one. However, the Legislature's failure to provide for either type of period can be construed as an indication that no effect on vested causes of action was intended. When the Legislature, in enacting prescriptive statutes potentially affecting existing causes of action, fails to require parties to exercise vested rights within a reasonable time, the courts should refrain from supplying this legislative lapse.
Moreover, the Legislature did not simply shorten a prescriptive period in enacting La. R.S. 9:5628, but rather substituted, at least in part, a peremptive period for a prescriptive period. Under these circumstances, there is even more reason for a court to decline to supply a requirement for asserting vested claims within a shortened period when there is no express or implied indication of such a legislative intent. Here, the Legislature failed to provide in the statute a requirement that persons adversely affected by the enactment of La. R.S. 9:5628 must assert vested claims within a shortened period, and we decline to read such a period into the statute.
Maltby, 506 So.2d at 1192-1193 (footnotes omitted).
In clear and unambiguous language, the Legislature failed to expressly declare in La. R.S. 9:5605, as enacted in 1990, that persons with vested claims were required to file suit in a shortened period; and we are prevented from supplying such period by implication or judicial finagling. While the Legislature clearly expressed in 1992 an intent to apply La. R.S. 9:5605 retroactively to all claims falling within its ambit arising before or after its enactment, this declaration came too late to bar Hendrick *660 from filing his claim, which was filed on January 10, 1991. La. R.S. 9:5605 is inapplicable to Hendrick's legal malpractice claim. See Marsh Engineering, Inc., 94-1129 at 11, 688 So.2d at 1048.
The question still remains as to whether Hendrick's lawsuit was timely under La. C.C. art. 3492. Our examination of Lima v. Schmidt, 595 So.2d 624 (La. 1992), leads us to believe it was. The following quoted language from Lima is dispositive of this issue.
At the outset, we observe that prescriptive statutes are strictly construed against prescription and in favor of the obligation sought to be extinguished; thus, of two possible constructions, that which favors maintaining, as opposed to barring, an action should be adopted. Foster v. Breaux, 263 La. 1112, 270 So.2d 526 (1972); Knecht v. Board of Trustees for Colleges and Universities, 525 So.2d 250 (La.App. 1st Cir.), writ denied, 530 So.2d 87 (La.1988); Odessa House v. Goss, 453 So.2d 299 (La.App. 3rd Cir.1984). To soften the occasional harshness of prescriptive statutes, our courts have recognized a jurisprudential exception to prescription: contra non valentem non currit praescriptio, which means that prescription does not run against a person who could not bring his suit. Harvey v. Dixie Graphics, Inc. and Touche Ross & Co., 593 So.2d 351 (La.1992); Plaquemines Parish Comm'n Council v. Delta Development Co., Inc., 502 So.2d 1034, 1054 (La.1987); Cartwright v. Chrysler Corp., 255 La. 597, 232 So.2d 285 (1970). In Plaquemines Parish, supra, we observed that application of contra non valentem principles to claims arising out of the fiduciary attorney-client relationship has been considered in two Louisiana appellate cases: Elzy v. ABC Insurance Co., 472 So.2d 205, 208 (La.App. 4th Cir.), writ denied, 475 So.2d 361 (La.1985); and Jackson v. Zito, 314 So.2d 401 (La.App. 1st Cir.), writ denied, 320 So.2d 551, 553 (La.1975), overruled in part on other grounds, Cherokee Restaurant, Inc. v. Pierson, 428 So.2d 995, 999 (La.App. 1st Cir.1983).
In Elzy, supra, the Fourth Circuit noted that contra non valentem "may well be applicable where a lawyer has concealed his fault from the client or has otherwise prevented the client from bringing suit." 472 So.2d at 208. Similarly, in Jackson, supra, the First Circuit noted that "an attorney who remains silent when prescription has run against his client would, in light of his fiduciary duty to said client, be guilty of an act which effectually prevented the client from availing himself of his action against said attorney." 314 So.2d at 406-7. Applying these principles, in Plaquemines Parish, supra, we found that the continuous representation of plaintiffs by the defendants in their fiduciary roles as not only public officials, but also attorneys, coupled with other factors, warranted application of the contra non valentem exception.
More recently, in Braud v. New England Insurance Co., 576 So.2d 466 (La. 1991), we recognized that prescription will be suspended "during the attorney's continuous representation of the client regarding the specific subject matter in which the alleged wrongful act or omission occurred." Id. at 468 (collecting cases). This suspension principle is based on the third application of contra non valentem, which suspends prescription when the debtor has done some act effectually to prevent the creditor from availing himself of his cause of action. Blanchard v. Reeves, 469 So.2d 1165, 1168 (La.App. 5th Cir.), writ denied, 476 So.2d 347 (La.1985).
This suspension principle, labeled the "continuous representation rule," has been recognized by a host of Louisiana appellate decisions and has been widely recognized in other jurisdictions. See Annot., 32 A.L.R.4th 260 (1984). "[T]he continuous representation rule appropriately protects the integrity of the attorney-client *661 relationship and affords the attorney an opportunity to remedy his error (or to establish that there has been no error), while simultaneously preventing the attorney from defeating the client's cause of action through delay." Wall v. Lewis, 393 N.W.2d 758, 763 (N.D.1986). The rationale behind this rule is that "[a] plaintiff cannot justly be held to be `sleeping on his rights' when he is relying upon a honored fiduciary relationship." Note, Civil ProcedureStatute of Limitations Accrual in Attorney Malpractice Actions: Thorpe v. DeMent, 20 Wake Forest L.Rev. 1017, 1038 (1984). Indeed, to hold to the contrary "would require a client to hire a backup lawyer to continually review the work of the primary lawyer." Gill v. Warren, 751 S.W.2d 33 (Ky.App.1988); See also Olivier v. National Union Fire Insurance Co., 499 So.2d 1330, 1337 (La.App. 3rd Cir.1986) (contrary holding would allow attorney to defeat malpractice claim by using appeal process to continue relationship until prescription has run).
This rule is especially apt in the context of "an ongoing, continuous, developing and dependent relationship between the client and attorney, with the latter seeking to rectify an alleged act of malpractice." Peduto v. Durr, 97 App. Div.2d 959, 468 N.Y.S.2d 953, 955 (4th Dept.1983). This is such a case.
Lima, 595 So.2d at 629-630.
In late 1988, Hendrick learned that he possibly had a legal malpractice claim against the attorneys involved in the bankruptcy matter. At that time, Stone, Pigman was representing Hendrick in the RICO action, which, if successful, would have eliminated the basis of a malpractice claim against Stone, Pigman. Stone, Pigman's representation of Hendrick continued through the United States Supreme Court's denial of Hendrick's writ application on October 1, 1990. Just three months after Stone, Pigman's representation ended, Hendrick filed the instant suit against Stone, Pigman. Thus, applying the suspension principle in the form of the "continuous representation" rule to this case, we determine that Hendrick's action was timely filed.

Apportionment of FaultStandard of Review
Stone, Pigman asserts that it was legal error for the trial court to fail to apportion fault among all the persons responsible for the procedural deficiencies giving rise to this action.
Louisiana Civil Code article 2323 provides in pertinent part:
A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law or legal doctrine or theory of liability, regardless of the basis of liability.

* * * * * *
Louisiana Civil Code article 2324(B) provides:
B. If liability is not solidary pursuant to Paragraph A, then liability for damages caused by two or more persons shall be a joint and divisible obligation. A joint tortfeasor shall not be liable for *662 more than his degree of fault and shall not be solidarily liable with any other person for damages attributable to the fault of such other person, including the person suffering injury, death, or loss, regardless of such other person's insolvency, ability to pay, degree of fault, immunity by statute or otherwise, including but not limited to immunity as provided in R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable.
These articles were amended in 1996 to add language "making it mandatory for the determination of the percentage of fault of all persons contributing to an injury, whether those persons are unidentified non-parties, statutorily immune employers, or others."[5]Keith v. United States Fidelity & Guaranty Company, 96-2075, p. 5 (La.5/9/97), 694 So.2d 180, 182. Therefore, the trial court was required to determine the percentage of fault, if any, of the other attorneys previously dismissed from this action and hold Stone, Pigman liable only for its "degree of fault." It was legal error for the trial court to fail to quantify the fault of the other attorneys.
Where the trial court commits legal error by applying an incorrect legal standard, this court is required to determine the facts de novo from the entire record and render a decision on the merits. Bell v. Ayio, 97-0534, p. 4 (La.App. 1st Cir.11/13/98), 731 So.2d 893, 897; Ferrell v. Fireman's Fund Insurance Co., 94-1252, p. 7 (La.2/20/95), 650 So.2d 742, 747. Thus, we review the liability issue in this case de novo.

Attorney-Client Relationship
There are three elements to a legal malpractice claim: (1) the existence of an attorney-client relationship, (2) negligent representation by the attorney, and (3) loss to the client caused by that negligence. Francois v. Reed, 97-1328, p. 4 (La.App. 1st Cir.5/15/98), 714 So.2d 228, 229-230; Prestage v. Clark, 97-0524, p. 9 (La.App. 1st Cir.12/28/98), 723 So.2d 1086, 1091, writ denied, 99-0234 (La.3/26/99), 739 So.2d 800. The existence of an attorney-client relationship turns largely on the client's subjective belief that it exists. Louisiana State Bar Association v. Bosworth, 481 So.2d 567, 571 (La.1986). The absence of a signed employment agreement, alone, is insufficient to defeat a claim that the relationship exists. Francois, 97-1328 at 4-5, 714 So.2d at 230. The proper method of determining whether an attorney's malpractice is a cause in fact of damage to his client is whether the performance of that act would have prevented the damage. Prestage, 97-0524 at 9, 723 So.2d at 1091.
Once a prima facie case of malpractice has been made by plaintiff, the burden of proof shifts to defendant, and the attorney bears the burden of proving that the litigation would have been unsuccessful. Ault v. Bradley, 564 So.2d 374, 376-377 (La.App. 1st Cir.), writ denied, 569 So.2d 967 (La.1990); Nelson v. Waldrup, 565 So.2d 1078, 1079 (La.App. 4th Cir.), writ denied, 569 So.2d 962 (La. 1990).

The Existence of an Attorney-Client Relationship
The bankruptcy trustee, Donald P. Starns ("Mr. Starns"), was represented by David S. Rubin ("Mr. Rubin"), who was appointed by the bankruptcy court. Sometime in late 1984, Mr. Starns was informed of an offer to purchase Hendrick's stock in PFC for $143,000.00, plus twelve and one-half percent attorney's fees. After receiving the offer, Mr. Starns attempted to have Steve Waldrop ("Mr. Waldrop"), the trustee's certified public accountant, determine the value of PFC and Hendrick's stock from some old financial *663 statements, to assist him in deciding whether and, if so, at what price the stock should be sold. According to Mr. Starns, Mr. Waldrop valued the stock at about $150,000.00 or $160,000.00. Based on this valuation, Mr. Starns recommended the $150,000.00 sale to the court.
According to Mr. Starns, he proposed the sale because the estate needed cash immediately and there was pressure to "close the case or to wrap the case up." Furthermore, as testified to by Mr. Starns, the estate needed cash to attend to a number of issues and administrative expenses that required payment. In his trial testimony, Mr. Rubin reiterated Mr. Starns testimony that there was an urgent need to liquidate the stock because Hendrick's ex-wife was threatening to sue if the offer was not accepted. There were numerous expenses that needed to be paid, and creditors, including Hendrick's ex-wife, had to be paid. Thus, Mr. Starns had Mr. Rubin prepare the order which he submitted to the court at the time he filed the application for approval of the sale.
According to Mr. Starns, at the February 13, 1985 hearing, the judge approved the sale "and directed [him] as trustee to investigate the matter ... concerning the financial statements that had been brought to [their] attention." Language to this effect was included in the minute entry of the hearing, but the order was never revised to include the investigation as a condition of the sale. Thereafter, Mr. Starns sought to retain special counsel to handle the investigation. On April 19, 1985, Mr. Starns applied to the court for approval of Stone, Pigman as special counsel to handle the matters. An order approving the appointment of Stone, Pigman as special counsel was entered on April 29, 1985, and signed on May 24, 1985.
Thereafter, Stone, Pigman conducted an investigation, which included reviewing the financial records of PFC and the taking of several depositions of various people associated with the company. According to Mr. Starns, he, Mr. Rubin, Hendrick, and Mr. Steffes had several meetings with Stone, Pigman and discussed a number of different options as to remedies available to Hendrick. According to Mr. Starns, although rescission of the sale was discussed, it was not a viable option because the estate no longer had the proceeds of the sale to return to the purchasers.
Finally, Mr. Starns testified that based upon his observations and knowledge of the facts of the case, he never believed Stone, Pigman represented Hendrick. According to Mr. Starns, Stone, Pigman represented him as the trustee in the bankruptcy case. Also, Mr. Rubin testified that although he had several meetings alone with Hendrick, he never considered there was any type of attorney-client relationship between them.
In the bankruptcy proceedings, Hendrick was directly represented by William Steffes, who has been doing mostly bankruptcy work since he was admitted to the Louisiana State Bar Association in April or May of 1978. Prior to the February 13, 1985 sale, Mr. Steffes, prepared an application to the bankruptcy court objecting to the sale on the basis that, in comparison to the total sale price of the entire company, and the dollar amounts being paid to Mr. Polk for his shares, Hendrick was being offered an insufficient amount for his share of the stock. Additionally, Mr. Steffes presented some testimony at the hearing in opposition to approval of the sale. Nevertheless, the sale was approved. According to Mr. Steffes, he did not appeal the decision because he did not think there were grounds for an appeal based on the record, which contained the court's approval of the sale subject to the right to further investigate the matter. Mr. Steffes continued to represent Hendrick in the bankruptcy matter until it was eventually settled in October of 1987.
According to Mr. Steffes, the lawyers at Stone, Pigman dealt directly with Hendrick, and such dealings were not unusual in this case. He further testified that, *664 although he and his client had numerous communications with Stone, Pigman attorneys, Mr. Starns, and Mr. Rubin, he was never asked for any suggestions as to how the investigation should proceed nor was his opinion ever solicited.
At trial, Hendrick testified that he had numerous meetings and telephone conversations with attorneys of Stone, Pigman. Specifically, he had various conversations with Randall Smith ("Mr. Smith"), the Stone, Pigman associate who did a large portion of the work associated with the Hendrick matter. Additionally, Hendrick testified and exhibits in the record indicate that Stone, Pigman sent him several attorney/client confidential memoranda and other correspondence and signed the February 12, 1986 complaint as attorneys for the plaintiffs, including Hendrick, which all gave him the impression that Stone, Pigman represented him directly.
William Brown ("Mr. Brown"), John Landis ("Mr. Landis"), and George Freeman, III ("Mr. Freeman"), attorneys of Stone, Pigman, all testified that Hendrick was not their client. According to these attorneys, they were retained by and represented Mr. Starns, the bankruptcy trustee. However, Mr. Smith admitted at trial that for purposes of the complaint filed in federal district court on February 12, 1986, which named Hendrick as one of the plaintiffs, Stone, Pigman represented Hendrick.
Mr. Alston Johnson ("Mr. Johnson") testified as an expert for Stone, Pigman regarding when an attorney-client relationship is established. According to Mr. Johnson, the parties have to reach a mutual agreement as would be required in any other contract. Furthermore, the relationship may be limited specifically to certain tasks agreed upon by the parties. According to Mr. Johnson, from his review of the information related to the underlying claims giving rise to this malpractice suit, an attorney-client relationship between Hendrick and Stone, Pigman commenced at the earliest on June 18, 1986, which is the date the bankruptcy trustee abandoned the RICO action to Hendrick. This opinion is based on the information provided to Mr. Johnson indicating that Stone, Pigman came into the case as special counsel to the trustee in April or May of 1985, and continued in that capacity until the trustee abandoned the cause of action. According to Mr. Johnson, being special counsel for the trustee made it impossible for Stone, Pigman to have an attorney-client relationship with Hendrick. However, Mr. Johnson admitted on cross examination that naming Hendrick as a plaintiff in the RICO action, and the signing of the complaint by Mr. Smith on behalf of Stone, Pigman as attorneys for the plaintiffs, "might well be" a representation to the federal court that they represented Hendrick in the matter.
David Kline ("Mr. Kline"), a former United States Bankruptcy Judge for the Western District of Oklahoma, testified on behalf of Stone, Pigman as an expert in the field of bankruptcy. Mr. Kline testified that an attorney-client relationship arose between the trustee and Stone, Pigman when the bankruptcy court approved the application that Stone, Pigman be appointed as special counsel. According to Mr. Kline, Stone, Pigman's representation of Hendrick did not begin until the bankruptcy court ordered the abandonment of the RICO action and all rights to Hendrick, which was three or four months after the suit was filed and was too late in time to file a Rule 60(b) motion.
Regarding the question of whether special counsel can represent the trustee and debtor simultaneously, Mr. Kline opined that "you cannot serve two masters." According to Mr. Kline, the bankruptcy rules prohibit an attorney from representing two parties. However, if the parties' interests are parallel, simultaneous representation is not prohibited.
After a thorough review of all the testimony, both expert and lay witnesses, and the exhibits, we are of the opinion that *665 Hendrick had a reasonable basis for his belief that Stone, Pigman represented him. Thus, we now must determine whether Stone, Pigman was negligent in that representation.
On December 15, 1999, Stone, Pigman filed a motion for leave of court to file a supplemental brief in this appeal. The motion was granted by order dated December 16, 1999. In response to Stone, Pigman's supplemental brief, Hendrick also filed a supplemental brief.

Supplemental Briefs Regarding Attorney-Client Relationship
In the supplemental briefs, each party argued that Roberts v. Fearey, 162 Or. App. 546, 986 P.2d 690 (1999), which was decided by the Court of Appeals of Oregon on September 15, 1999, supports its argument with respect as to whether there was an attorney-client relationship between Stone, Pigman and Hendrick. Roberts presented the question of "whether a trustee's attorney can be liable to the beneficiaries of the trust for legal malpractice." Roberts, 162 Or.App. at 548, 986 P.2d at 691. The court answered the question in the negative holding that "when an attorney undertakes to represent a fiduciary, he or she represents only the fiduciary and does not, at the same time, maintain an attorney-client relationship with those to whom the fiduciary-client owes a duty." Roberts, 162 Or.App. at 553, 986 P.2d at 694. According to the court, an attorney would only be liable to a non-client in one of three circumstances that indicate a de facto relationship justifying the imposition of a duty on the defendant: (1) where the attorney purported to act as the plaintiff's attorney by filing a motion on behalf of the plaintiff; (2) where the plaintiff was the "intended" third-party beneficiary of the attorney's relationship with a client; and (3) where the attorney stipulated to perform a service for the opposing party. Roberts, 162 Or.App. at 551-552, 986 P.2d at 693-694.
First, we note that while the Roberts decision may have some persuasive value, it is in no way controlling authority. We also note that, under Louisiana law we look not only to the actual existence of a contract between the parties, we look to whether the plaintiff had a reasonable subjective belief that such a contract existed as a determinative factor of the attorney-client relationship question. And as previously expressed, we believe Hendrick had such a reasonable belief. Nevertheless, we believe that were we to follow the principles set forth in Roberts, this case is distinguishable in that it falls under the first exceptional circumstance, i.e., the signing of the February 12, 1986 complaint by a Stone, Pigman attorney as counsel for plaintiffs including Hendrick.

Negligence of Stone, Pigman
Mr. Smith, the attorney who did much of the initial work and legal research after Stone, Pigman was retained as special counsel, testified at trial regarding the extent of the firm's involvement in the underlying matter. According to Mr. Smith, at the initial meeting, Mr. Starns conveyed to them certain information that led them to believe that Hendrick had received an insufficient amount of money for his ten percent interest in PFC. Looking at the Nuttall report, which was prepared in connection with another lawsuit by Al Collins[6] involving PFC and the value of the company, they believed the company was worth over five million dollars. Taking ten percent of that, then subtracting the $150,000.00 actually received and multiplying that value by three, they believed they had a case valued at about one million dollars, plus attorney's fees.[7]
*666 Mr. Smith was instructed to begin determining the facts of the case and doing some research on possible RICO and fraud claims. At either the first or second meeting, he was provided with a copy of an excerpt of the February 13, 1985 hearing. According to Mr. Smith, the testimony of Mr. Fink at this hearing led the trustee and the judge to suspect that important information had been concealed from Hendrick. Mr. Smith also testified that the excerpt showed that the judge authorized the sale, but instructed the trustee to investigate and bring an action if necessary.
During the "investigation" period Mr. Smith received pleadings, depositions, and other information in connection with the Collins lawsuit that the firm thought was relevant to Hendrick's claims. Additionally, Mr. Smith deposed various individuals associated with PFC, including Al Fink, Debbie Fink, Seal O. Polk, and several other individuals.[8] All the information and depositions were reviewed by Stone, Pigman to determine if there was a basis for filing an action on behalf of the trustee. In May 1986, Mr. Smith prepared a letter for Mr. Landis' signature to the trustee regarding the results of their research. Although the letter was sent, they did not receive a response until sometime in September, when Mr. Rubin contacted them about meeting to examine possible RICO and securities fraud claims. After that meeting, some additional depositions were taken in November 1985, and January 1986, to gather additional information to support filing a claim on behalf of the trustee.
According to Mr. Smith, because they had some concerns about whether Hendrick should have known much of the information regarding the value of the company prior to the February 13, 1985 sale, they presented rescission as a possible option. However, the trustee did not want to get the stock back. According to Mr. Smith, Mr. Starns informed them that this minority stock in a closely held corporation had produced no money and they did not want it back. Instead, the trustee was interested in a RICO suit where they could get treble damages and attorney's fees in connection with the amount that should have been paid at the sale.
According to Mr. Smith, he drafted the complaint that was filed on February 12, 1986. Prior to filing, however, the complaint was reviewed by other Stone, Pigman attorneys such as Mr. Landis, Michael R. Fontham ("Mr. Fontham"), and Mr. Freeman.
Mr. Brown, who was a partner at Stone, Pigman in 1985, testified at trial regarding his involvement in the Hendrick matter. In October 1985, he was asked to consult with Mr. Smith, the associate working on the case, concerning potential RICO claims or fraud claims. He reviewed and made some revisions to the complaint that was filed in federal district court on February 12, 1986. Mr. Brown felt that at the time the complaint was filed, there were sufficient grounds to bring the claim and that the claim was filed in good faith.
When asked about his knowledge of Southmark Properties v. Charles House, 742 F.2d 862 (5th Cir.1984), Mr. Brown admitted that he was actually one of the attorneys of record on that case. Southmark was decided by the Fifth Circuit Court of Appeal on September 28, 1984, prior to Mr. Brown's involvement in the Hendrick matter.
According to Mr. Brown, Southmark was never considered or discussed in connection with this case because
[t]he Southmark case was completely different than the case Starns v. Avent. They were different cases. In Starns v. Avent as you call the Hendrick case, there was a reservation of rights. The bankruptcy judge had said I'm going to *667 authorize the sale of the property but we're reserving the rights to bring a damage claim. There was a bankruptcy authorization to bring it and it was a conditional sale in my mind. The Southmark case was totally different than that. There was no reservation of rights, there was no bankruptcy authorization, there was no conditional sales. It was a final sale. So the Southmark case never came to my mind, they were completely different.... So Southmark just didn't ring a bell because it wasn't applicable. We had a reservation of rights, it was a different situation. Only when the reservation of rights were later invalidated because there was an order that somebody didn't know about that came later, an extra order, that's the only time that Southmark came up when they foundsomebody found that order and said look something is wrong here. But the bankruptcy lawyers, the bankruptcy judge, all the people that did that didn't catch it and so to say that I should have caught that I think is just wrong.
According to Mr. Brown, he never researched or investigated whether the reservation of rights at issue was valid because Stone, Pigman was not hired as bankruptcy counsel to look into the reservation of rights. He, specifically, was asked to look into the RICO claims, the possibility of security fraud claims, and the blue sky claims. According to Mr. Brown, they were told that rights had been reserved, and he had no reason to go behind or be suspicious of what was done by the bankruptcy lawyers.
Mr. Brown never asked to see the bankruptcy order approving the sale because he knew that Mr. Landis, William Steffes and David Rubin, the bankruptcy lawyers, had looked at the order. He had no reason to question them because they were the bankruptcy experts not him. Finally, Mr. Brown testified that he never had contact with Hendrick or anyone outside the Stone, Pigman firm concerning the matter.
Mr. Landis of Stone, Pigman was the partner who oversaw the file from the beginning of the firm taking on the matter. His understanding was that Stone, Pigman was retained to serve as special counsel to investigate the circumstances of the sale and to bring a security fraud action based on the investigation.
Mr. Landis acknowledged that any action involving a bankruptcy matter must be approved by order of the bankruptcy judge. However, after receiving only the minute entry, they did not receive and did not request a copy of any additional formal order authorizing the sale.
Mr. Landis testified that Southmark was never discussed by him as having any implication on the Hendrick matter. According to Mr. Landis, they were hired by Mr. Starns through Mr. Rubin "to act as special counsel, to investigate the facts of the sale, and to bring a security's fraud case, a damages action if one was merited." Stone, Pigman was not asked to consider what had been done in the bankruptcy proceedings, nor was the firm asked to look behind what Mr. Rubin had done.
Mr. Fontham, a partner at Stone, Pigman who was also a partner in 1986, was brought into the group working on the federal RICO suit around September 1986, to serve as lead trial attorney. However, after litigating the abuse of process hearing in 1986, he was not heavily involved in the case again until early 1987.
Mr. Fontham testified that he never discussed with Hendrick the issue of whether or not his underlying claims had been lost due to the negligence of any attorney. Mr. Fontham explained that he never had such a discussion because Hendrick had not lost his underlying claim. According to Mr. Fontham, the claim was not lost until the Met-L-Wood decision was rendered in November 1988, which is the case *668 that was heavily relied on by Judge Polozola to throw out the case.
According to Mr. Fontham, they did not believe the difference between the order and the minute entry was of any significance. The law indicated that they could bring a securities and RICO action. However, Judge Polozola's ruling changed everything. According to Mr. Fontham, prior to this decision, no other judge had ever ruled that fraud committed to cause an order to be issued could be extinguished by that order itself.
In other words, if someone came into a judge and lied to get an order issued, that that order was saying no fraud ever occurred well thatno court had ever ruled that before. And this Met-Wood case for the first time suggested that an order issued because of fraud could also eliminate any cause of action for the fraud. Which we thought up until that time was pretty unlikely, so but it happened. But even then, even then we thought we would win in the Fifth Circuit because we thought that that was a bad decision, and the Fifth Circuit would not go along with the Seventh Circuit on that. So, no, it never occurred to me to sue anybody.
Additionally, according to Mr. Fontham, they attempted to settle the case, but Hendrick was unreasonable. Although the problems with proving damages were explained to Hendrick, he refused to agree to a reasonable number. Finally, after Mr. Fontham explained the situation to him, Hendrick agreed to $4,000,000.00 as a settlement number. According to Mr. Fontham, he then knew that they were not going to settle the case and the case would go to trial because the defendants in the RICO action would not agree to that amount.
Mr. Freeman testified that they never recommended to Hendrick the possibility of a legal malpractice claim because they did not believe that "anybody had done anything wrong" for several reasons. According to Mr. Freeman, first,
we were firmly of the view that up until November 7 or 8, 1988, the law regarding res judicata and collateral estoppel was in our favor, but then when the Met-L-Wood decision was handed down, the law changed. I didn't feel that you could hold Mr. Steffes or Mr. Rubin back in 1985, 1986, to a change in the law that occurred two years later. Contrary to what Mr. Hendrick has contended, this isn't the case where we came in, drafted a RICO complaint, filed it in federal district court, and the defendants, Mr. Avent and crew, said, oops, I'm sorry. You filed the wrong claim in the wrong court and, by the way, you filed it too late. Southmark means you never had a claim to begin with. Immediately after the case was filed, your honor, the defendants came in and they filed a motion to dismiss. They didn't even mention Southmark, and I think that was because, our view was, because they didn't think Southmark applied at that point. Their first motion to dismiss said nothing whatsoever about Southmark. Eighteen months later, the[y] bring Southmark to our attention, to the court's attention, and argue that it is governing. Presumably, Mr. Avant and the other lawyers didn't commit malpractice during that 18 month period against, you know, H.E. Avent and Company by not bringing Southmark to the attention of the court. So 18 months later, Southmark comes to the attention of Judge Polozola. He denies the motion for summary judgment.
The second reason, according to Mr. Freeman, was that the only relief that appeared to be available to Hendrick was to file a Rule 60(b) motion, which Mr. Freeman testified that they did not believe Mr. Rubin or Mr. Steffes could have won.[9] *669 Lastly, Mr. Freeman testified that no one had really made a mistake at all in not giving them the order because it really did not make a difference. They did not believe that the order extinguished any existing claims, such as a RICO claim or a securities fraud claim.
Risley Triche ("Mr. Triche"), an attorney who has practiced law in both federal and state courts since 1951, testified as an expert witness for Hendrick. According to Mr. Triche, the duties of an attorney are to:
[I]nvestigate the case, the facts and circumstances of the case, to test the accuracy of what's being related to him by his client, to investigate the facts and circumstance[s], to make a legal research of the law available and inform himself of the appropriate steps that have to be taken. The process is necessary to represent his client's interest, and always at all times keep in touch with his client and to inform his client of the result of his investigation to inquire as in research. A lawyer has to process (sic) the skills, competence, training he holds himself out to have. He has to use those reasonably in the handling of his client's case, and he has to do it in accordance with the standard of care in the community in which he practices.
When asked to elaborate further on the specific duties associated with an attorney's investigation of a case, Mr. Triche stated:
[It d]epends on the facts and circumstances of each individual case. It's the obligation of the lawyer, the obligation of the attorney to inform himself of all of the facts and circumstances pertinent to the best interest of his client. If they (sic) are precedent, orders, judgments, minute entries involved[,] it is the obligation of the lawyer to review those matters, investigate those matters, and inform himself of the efficacy of those things. It's the obligation of the lawyer as well as to satisfy himself that there is a reasonable basis for bringing the case, and making the allegations, going forward, and it is the obligation of the lawyer to keep his client informed of what he finds. Generally speaking[,] a lawyer has to be diligent and insidious in investigating the facts and circumstances, and the legal research has to be done and has to be done properly so that he can advise his client.
At trial, Mr. Triche was asked his opinion as to whether Stone, Pigman's handling of the matters at issue met the standard of care required of counsel. According to Mr. Triche,
... the investigation and the inquiry in the earlier of the case fell below the standard of care.... [I]t's a lawyer's obligation to review the antecedent proceedings that bring the case to him. All of this case dealt with transactions, fraud, or otherwise that led to the sale of Mr. Hendrick's stock in February of 1985, all of that. Somebody says they sawsomebody in the law firm says they saw a minute entry. I think Mr. Randy Smith says I thought the minute entry was the judgment, that's not appropriate. Mr. Landisexcuse me. Mr. Smith should have sought out the judgment in the bankruptcy court, should have reviewed it with his associations that were reviewing that file, and should have been alerted that they had a time bar problem, and that should have been alerted to them in the early stages of the case. I saw the testimony that well, we looked atin the deposition well, we looked at the minute entry. Mr. Smith says I thought the minute *670 entry was a judgment, that's elementary. A minute entry is not a judgment. The other lawyers say we never bothered to look beyond that, we were satisfied with looking at the minute entry. Lawyers know. The lawyers that I have experience with know, and I'm sure they know that in the Stone Pigman firm. Lawyers know that minute entries are not judgments.
* * * * * *
Minute entries don't represent the rulings of the court and don't represent the judgments of the court. These lawyers should have been alerted, should have gone to the judgment of February 13, 1985, should have looked at the judgment and they would have disabused themselves immediately of the notion that's been argued in this case, and pretrial motions, and otherwise that the minute [entry] reserves some rights excuse methat the judgment ordering the sale reserves the rights to attack the sale. It's not what the minute entry says, and certainly not what the judgment says. The judgment orders the sale of the property. The judgment orders the sale free and clear of encumbrances and claims, very very plain. The next question is once having seen that, do the lawyers have a time bar problem? Do they have ... a res judicata problem? Do they have a time bar problem? All lawyers are alerted to time bar problems, all lawyers. In Mr. Smith's memorandum of December 1985 when he's telling Mr. Hendrick and the other folks, the trustee and the others, what he's found, that we have a good case, and I'm paraphrasing. He says in his memorandum, we don't have a prescription problem, there's no reason to bring this case before February 1996(sic). He's thinking about time bar problems. All lawyers think about those.
* * * * * *
They should have recognized, oh, oh, how can we go behindbeyond this judgment? They had lawyers in the firm that came on board that handled litigations in this particular area. Lawyers have to use the knowledge that they have for the benefit for their client. They can't forget about some cases and forgot (sic) the law that you have when you're looking at your client's case. You have to bring the knowledge you have to the application for the benefit of your client. Somebody, and I'm lost to understand how it was never discussed, why it was never brought up, somebody should have seen we have a res judicata problem, we have a time bar problem, Southmark tells us, Met-L-Wood tells us, the civil code tells us you got bring you got to set this judgment aside, the judgment of February 13, 1995(sic) authorizing the sale. You have to set that aside otherwise res juda (sic) stops and your (sic) time barred from doing that. Sixty (B) says itself that these cases to set judgments aside for fraud have to be brought within a year, at least a year because it set the time as prescriptive period says at a year. This matter should have been alerted to these good lawyers that one, there's a res judicata problem, two, there was a time bar problem, and three, they should have acted immediately.
Mr. Johnson further testified "as an expert in the field of standards of care in federal and state court litigations including practice and procedure, and standards of care relating to the commencement, termination and scope of the attorney-client relationship under Louisiana law." According to Mr. Johnson, the general standard of care for a Louisiana attorney is to "possess and exercise his ability, learning and skill to handle the task that is assigned to him, and that he is expected to not only possess that but exercise it as the task that is assigned."
When asked whether Stone, Pigman acted reasonably in investigating the matter, Mr. Johnson opined that Stone, Pigman *671 conducted a reasonable investigation. Furthermore, Mr. Johnson opined that Stone, Pigman was not negligent in relying on the information they were provided regarding the stock sale. His basis for this opinion is that the trustee and the debtor were represented by competent bankruptcy counsel, and, thus, there was no need to duplicate their efforts. "Stone, Pigman was given a very specific task and in that task they were quite permitted to rely upon the representations that were made to them.... I don't [think] they were negligent; yes, I think they were reasonable in relying upon it."
Additionally, Mr. Johnson did not believe that Stone, Pigman was negligent in failing to file a Rule 60(b) motion. According to Mr. Johnson, the exceptional standard required in proving such a motion, together with his understanding of Judge Polozola's decision in the RICO action, suggested to him that the motion probably would have been denied if filed. Mr. Johnson also did not believe that the Southmark decision should have been looked at by Stone, Pigman as relevant to their investigation of the matter for which the firm was retained. According to Mr. Johnson, Southmark did not present the same situation as did the stock sale at issue in Hendrick's situation. According to Mr. Johnson, "[no] reasonable lawyer would believe that Southmark would have produced ultimately the result that the Fifth Circuit seemed to have thought it would have produced five or six years later." However, on cross-examination, Mr. Johnson admitted that a reasonably prudent attorney should have at least considered the implications of Southmark when deciding what to do in the Hendrick matter.
Mr. Johnson opined that, in his decision, Judge Polozola appeared to rely on the Seventh Circuit's decision in the Met-L-Wood case of November 1988, which established a rule of law different from that previously expressed by the Fifth Circuit.
In sum, Mr. Johnson's opinion was that the Stone, Pigman attorneys made the best choice they had under the circumstances. According to Mr. Johnson, they complied with all the applicable standards of care.
According to Mr. Kline, special counsel is not authorized to duplicate "in theory" the work performed by general counsel. According to Mr. Kline, special counsel "must justify his existence, separate and independent from any functions being performed by the counsel for the trustee job."
According to Mr. Kline, as far as the assets and what action should be taken concerning the same, the trustee has the control and decision making authority. Therefore, before special counsel can take any action, as with any client, the decision whether to proceed and, if so, how to proceed, rests with the trustee.
When asked what significance res judicata has in bankruptcy proceedings, Mr. Kline testified that it simply means that if a matter has been litigated or if you had the opportunity to litigate a matter and did not, then res judicata prohibits you from litigating the matter again in the future. The cases that Mr. Kline believed were significant to the bankruptcy aspects of the underlying claim included Southmark Properties v. Charles House Corporation, 742 F.2d 862 (5th Cir.1984); In re Met-L-Wood Corporation, 861 F.2d 1012 (7th Cir. 1988), cert. denied sub nom ., Gekas v. Pipin, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989), D-1 Enterprises, Inc. v. Commercial State Bank, 852 F.2d 823 (5th Cir.1988), withdrawn and superseded on reh'g, 864 F.2d 36 (5th Cir.1989); Starns v. Avent, 96 B.R. 620 (M.D.La. 1989); and Hendrick v. Avent, 891 F.2d 583 (5th Cir.), cert. denied, 498 U.S. 819, 111 S.Ct. 64, 112 L.Ed.2d 39 (1990). According to Mr. Kline, Southmark stood for the principle that the types of sales at issue need some finality.
The finality is critical because you're trying to look after the secured creditors and the unsecured creditors, and Southmark *672 surely stands for the fact that when everything is said and done, when you come in there and a sale is held, properly noticed, you don't come around directly or indirectly and try to attack that sale. That'sthat surely is what it stands for.... You've got toif you're going to have the trustee of somebody sell this property, buyers have got to know. They have to got to know that when they pay this money and it's heard that they have this property, and then if it isn't appealed within ten days, why it's final and I don't have to worry about somebody coming after me later.
According to Mr. Kline, he was surprised that the court of appeals, in affirming Judge Polozola's decision, distinguished D-1 Enterprises. "D-1 was a contested matter where there weren't any pleadings and it was a motion to lift the stay and the courts (sic) there said, well, you know, there really wasn't any opportunity to litigate these collateral matters and so I'm not going to say that this is res judicata and bars it. And it was a contested matter meaning under bankruptcy rule 9014." The court of appeals found a distinction between a "contested" and an "adversarial" proceeding. The court found that the hearing for approval of the sale was an adversarial proceeding where the parties had an opportunity to effectively litigate all of the matters; thus, in this case, unlike in D-1 Enterprises, res judicata applied.
As to the Met-L-Wood case, Mr. Kline opined that it was
an evolution of the law in terms it was the first time ... where it referred to RICO and said, you know, you can't, for fraud or something independent, if you're even indirectly challenging this sale, which is what this ended up holding, if you're even indirectly doing that, you can't get around it, ... Met-L-Wood said ... you had a bankruptcy sale where two years after it happened, as I recall, the trustee came in seven months, as a Chapter Seven trustee after a sale was made, and the creditors came in and the big player was the secured creditor who was permitted to come in and to bid, and then two years later, they tried to go to state court and assert some securities matters and the court said, no, you can't use RICO or these independent things because a lawsuit first was filed almost two years later in the U.S. District Court in Chicago. And then about three months later, they went in and tried to 60(b) it in the bankruptcy court, which is the place they had to go. They said 60(b) but there again, this is 9024, but they tried to go there and the court said, no, you can't indirectlyyou can't come around here now and try and upset this sale. You had the opportunity.
Finally, when asked which attorney was responsible for filing a Rule 60(b) motion to attack the order approving the sale, Mr. Kline testified that responsibility was that of the bankruptcy counsel. According to Mr. Kline, "the only one in the world from that standpoint that would have the basic responsibility would be that lawyer." Nevertheless, on cross-examination, Mr. Kline admitted that there was no bankruptcy rule, federal rule of procedure, or statute that would have prevented Stone, Pigman from filing such a motion.
Also, on cross-examination, Mr. Kline testified that an attorney acting as special counsel has a duty to inform his client of legal malpractice. However, Mr. Kline opined that this was not a situation in which the attorney committed malpractice.
After carefully examining the record regarding the negligence issue, we believe that at the time they took on the investigation project, at the very least, Stone, Pigman should have requested and reviewed the order prior to beginning any work to verify the court's specific instructions. Stone, Pigman's failure to request and review the February 13, 1985 order of the bankruptcy judge, which did not contain the reservation of rights necessary to allow appellee to challenge the stock sale, *673 amounted to a failure to conform to the requisite standard of care required for competent attorneys. Accordingly, we now move to the question of damages.

Loss/Damages Sustained by Appellee
Stone, Pigman argues that the damage award of $2,867,540.00 is in conflict with the record, which according to Stone, Pigman demonstrates that Hendrick failed to prove any damage amount with reasonable certainty. Hendrick, on the other hand, asserts that the award should be trebled pursuant to the RICO Act.
Mr. Freeman of Stone, Pigman testified regarding the damages issue. According to Mr. Freeman, even when they were preparing for trial of the RICO action before Judge Polozola, they had concerns about proving damages. Mr. Freeman, testified that the RICO claim was of little or no value because the law was "in a state of flux" and was actually changed several months later; so there was no RICO claim to pursue. They were also concerned about damages under their disgorgement theory. According to Mr. Freeman, they believed that if the judge believed all the facts as presented, the judge could award disgorgement damages. However, they were not optimistic that the judge would award "the enhanced value of the stock" from February 1985 to December 1988. Mr. Freeman testified that they believed the judge would have awarded "the difference between the value of the stock, had all material disclosures been made on February 13, 1985, and the value he actually received." Stone, Pigman believed that difference in value to be between $100,000.00 and $150,000.00 more than the amount actually received by Hendrick.
During the bankruptcy proceedings, Mr. Waldrop, a certified public accountant licensed to practice in Louisiana, was retained by the trustee to determine the value of PFC and the value of Hendrick's stock in the company. A trial deposition of Mr. Waldrop was taken in January 1995, regarding his work on the case. Because he could not remember many of the details that happened in 1984 and 1985, he was allowed to use his 1987 deposition to refresh his memory.
According to Mr. Waldrop, he made a valuation of the net worth of PFC on November 12, 1984. He was supplied with various financial and operating statements, and tax information of the company. Using the book value of the company and adding goodwill based on a capitalized earnings approach, he valued the company at $3,352,388.00 on the date of the sale.
Mr. Waldrop testified that in December of 1984, he and Mr. Starns met with Mr. Polk, who informed them that he was selling his stock. According to Mr. Waldrop, the price per share that Mr. Polk was getting was "pretty much the same" in comparison to the $150,000.00 offer to Hendrick. Considering all the information available, Mr. Waldrop informed Mr. Starns the $150,000.00 was a reasonable price for the stock. Specifically, the fact that the stock was 10 percent of a closely held corporation, that Hendrick played no active role in the company, and that he received no cash flow from the stock ownership, a discount would have to be applied when valuing the stock.
Randy Rice, Ph.D. ("Dr. Rice"), an economics professor at Louisiana State University, testified on behalf of Hendrick as an expert witness in the field of economics and to give his opinion as to the valuation of PFC as of February 1985. According to Dr. Rice, he used three different valuation methods: (1) the short form discounted cash flow method, (2) the operating cash flow multiple, and (3) the pro forma discounted cash flow method. The short form discounted cash flow method, according to Dr. Rice, provides for "the quick application of some monies available at a point in time. It doesn't really require predictions of such as [one] go[es] into in the more preferred form, but it is a method that is often used in business valuations." The operating cash flow multiple *674 gives a rough estimate. The most often used method, and the method, according to Dr. Rice that has a real strong support basis, is the pro forma discounted cash flow method. Dr. Rice testified that the third method looks at what a willing and reasonably informed buyer and seller would be willing to exchange the property for at a given point in time.
Applying the three different methods, Dr. Rice came up with three different values of the company: $11,630,000.00, $14,994,000.00, and $19,750,000.00. Weighing the two lowest values each by thirty percent and the highest value by forty percent, Dr. Rice valued the company at $15,887,000.00, which is the result of combining these different methods. According to Dr. Rice, Hendrick's ten percent of the company's stock would be valued at $1,588,700.00. According to Dr. Rice, the $150,000.00 Hendrick received for his shares of PFC was not a fair price. However, Dr. Rice did admit on cross-examination that being in a situation such as Hendrick, having filed bankruptcy and being in need of liquid assets, might compel a person to sell his stock for less than its value. Additionally, Dr. Rice admitted on cross-examination that in his November 8, 1994 report, he valued Hendrick's stock as of February 1985 at $1,339,274.00. This lower dollar amount is based on employing a sixteen percent discount to account for Hendrick holding a minority interest in a closely held corporation and "the risk or the uncertainty of the monies[.]"
David T. Crary, Ph.D. ("Dr, Crary"), a professor of Finance at Louisiana State University, testified on behalf of Stone, Pigman as an expert in the field of corporate finance and business valuation. Exhibit 2150 lists the steps that were used by Dr. Crary to perform the valuation of the company. According to Dr. Crary this methodology has been subjected to peer review and can be found in any typical finance textbook or similar publication.
The methodology consists of the following eight steps: 1) collect historic financial information for the company, including income statements and balance sheets; 2) analyze historic levels of profitability, growth in revenues and expenses and the relationship of capital expenditures and working capital requirements (inventories and accounts receivable) to sales; 3) review sources of industry information to assess existing competition and potential future competition in order to make reasonable assumptions about future sales and profitability; 4) prepare projections of revenues and expenses, capital outlays, and working capital needs in order to forecast free cash flows; 5) develop a discount factor which seems appropriate for the riskiness of the business; 6) discount the future cash flows in order to develop a discounted present value of all expected future cash flows; 7) subtract the value of outstanding long term debt in order to determine the value of the equity; and 8) develop and apply discounts to account for (a) lack of marketability, (b) special firm weaknesses such as small size, dependency on one key individual, volatility of industry, and repurchase contingency on sales, and (c) minority position.
Using this methodology, Dr. Crary concluded that a ten percent interest of PFC as of February 13, 1985, had a value in the range of $226,000.00 to $264,000.00.[10]
On cross-examination, Dr. Crary admitted that he used an incorrect number of long-term debts to subtract from the net present value of the company. However, he believed the difference was very, very minor. In any event, repeating Dr. Crary's calculation using the correct long term debt number of $425,000.00, yields a valuation range for a ten percent interest in PFC of $230,000.00 to $269,037.00.
*675 Stone, Pigman also retained Kenneth H. Beer as an expert witness in the field of financial analysis and business valuation. Mr. Beer used seven different methodologies to determine the value of Hendrick's PFC stock as of February 13, 1985.[11] Using these different methods, Mr. Beer valued Hendrick's ten percent holdings in the range of $150,000.00 to $200,000.00.
After a careful review of the testimony, expert and lay, and the exhibits in the record regarding the issue of damages, we conclude that as of the date of the stock sale, Hendrick's stock should have been valued at $1,339,274.00. Subtracting from this amount the $150,000.00 Hendrick received for the stock, Hendrick is entitled to $1,189,274.00 in damages, plus legal interest. We decline to include in his damage award an amount for increased value in the stock after the sale occurred because his status as a debtor in bankruptcy indicated that, although he opposed the sale, his stock more likely than not would have had to be sold to liquidate assets to pay his creditors.
Contrary to Hendrick's argument regarding treble damages, we do not believe that we must necessarily concede that Hendrick would have been successful in the RICO action had it not been barred by res judicata. We believe we can determine that his stock was undervalued and the value that should have been assigned the stock, together with a determination that the order could have been successfully attacked with a Rule 60(b)(3) motion and subsequent remedial action, without reaching the likelihood of success on the merits of the claim that a pattern of racketeering activity is what caused the undervaluation of the stock. Thus, we decline to award treble damages.

Apportionment of Fault
As previously stated, it was error for the trial court not to apportion the fault of Mr. Steffes and Mr. Rubin. We believe by the nature of their involvement as bankruptcy attorneys from the outset of the bankruptcy matter, some percentage of fault should be assigned to these attorneys in addition to Stone, Pigman. Specifically, Mr. Steffes, as Hendrick's attorney, had knowledge that Hendrick did not believe he was being offered a fair price for his stock, and should have reviewed the order to be sure that the court's reservation of the right to investigate the sale was contained in the order. Also, Mr. Rubin, as the drafter of the order, should have known that the order needed to be revised to include the reservation language.
Accordingly, we apportion sixty percent of the fault to Mr. Steffes and Mr. Rubin (thirty percent each). The remaining forty percent of the fault we assess to Stone, Pigman. Thus, Stone, Pigman is responsible for $475,709.60 of Hendrick's damage award, plus legal interest.

Stone, Pigman's Reconventional Demand
Finally, Stone, Pigman asserts that it is entitled to recover from Hendrick the amount of $60,355.72 for out-of-pocket costs and expenses owed by Hendrick under his contingency fee contract with Stone, Pigman, with legal interest from the due date of each invoice. This assignment of error is without merit.
The principle of confusion is defined in La. C.C. art. 1903 which provides that "[w]hen the qualities of obligee and obligor are united in the same person, the obligation is extinguished by confusion." See, e.g., Doughty v. Insured Lloyds Insurance Company, 576 So.2d 461, 463 n. 5 (La.1991). Thus, Stone, Pigman's claim for payment of attorney's fees by Hendrick is extinguished.

*676 DECREE
For the foregoing reasons, the trial court's judgment finding that La. R.S. 9:5605 is inapplicable to Hendrick's legal malpractice claim is affirmed. The trial court judgment holding Stone, Pigman liable for the full amount of Hendrick's damages is reversed, and we render judgment in favor of Hendrick and against Stone, Pigman for forty percent of Hendrick's damages in the amount of $475,709.60, plus interest. Costs of this appeal are assessed to Stone, Pigman.
AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
FOIL, J., dissents and assigns reasons.
GONZALES, J., dissents for the reasons assigned by FOIL, J.
FOIL, J., Dissenting.
For the following reasons, I respectfully dissent.

Important Dates in this Case
February 13, 1985Bankruptcy Court ordered the sale of Hendrick's 310 shares of stock in PFC for $ 150,000.
February 23, 1985Time for appealing sale order expired
April 29, 1985Bankruptcy Trustee obtained permission from Bankruptcy Court to employ Stone Pigman to investigate the circumstances surrounding the sale of PFC stock to determine if claims might exist that could be pursued by the Trustee relating to the sale of the stock.
February 12, 1986After receiving approval of the Bankruptcy Court, Stone Pigman filed a federal RICO action. Hendrick was named as one of the plaintiffs.
June 18, 1986Bankruptcy Court abandoned the RICO action and the cause of action was referred to Hendrick.
January 1, 1987Written contingency contract was entered into between Hendrick and Stone Pigman.
January 24, 1989RICO suit was dismissed in the trial court.
January 11, 1990Dismissal of RICO suit affirmed.
The allegations of malpractice in this case result from an order of the Bankruptcy Court, dated February 13, 1985, which authorized the sale by the Trustee of 310 shares of stock in PFC owned by Hendrick, and that there was no timely appeal of that order and that a timely motion to set aside the order was not made.
At the time the order was issued, Stone Pigman was not involved in the matter. The main participants were Hendrick (through his attorney, hereafter called "Bankruptcy Attorney") and the Trustee.
Although Hendrick objected to the sale, he did very little to present any opposition to the Bankruptcy Court. The Bankruptcy Court ordered the sale, stating that it reserved its rights to investigate the sale and bring claims arising out of it. A minute entry was entered pursuant to those matters. However, when the sale order was issued by the Bankruptcy Court, the Trustee failed to include in it the reservation of rights.
Stone Pigman was not involved in this matter until a later date, April 29, 1985, over two months after the order of sale was issued and time for appealing the order (February 23, 1985) had expired. Then, Stone Pigmam was employed by the Trustee. Stone Pigman's job was to investigate as to any claims that might be pursued by the Trustee as a result of the sale. Stone Pigman recommended a RICO action, and the Bankruptcy Court approved it. Stone Pigman's only connection with this case was the RICO matter and the circumstances surrounding it. They were not responsible for any matters dealing with the setting aside of the sale orders. That was the responsibility of the Trustee and the Bankruptcy Attorney.
Since Stone Pigman was hired by the Trustee, their client was the Trustee at the beginning. And, as such, they should have *677 been able to rely on the information given them by the Trustee. If they should not have relied on the information given by the trustee, then they would be held responsible to the Trustee, their client, and no one else.
After the Bankruptcy Court abandoned the RICO action and conveyed it to Hendrick, he entered into a contingency fee contract with Stone Pigman to represent him. At that time, the sale order was final and nothing could be done about it. Stone Pigman pursued the RICO action with what was presented to them by the Trustee and the Bankruptcy Attorney. After the case was abandoned by the Bankruptcy Court, Hendrick took the case in the posture as it existed at that time. The case was lost. There is no evidence that Stone Pigman was in any way negligent in presenting the case to the courts. In fact, the case was lost in the district court based on a 1988 court case (Matter of Met-L-Wood Corp., 861 F.2d 1012 (7th Cir. 1988)). The latter case was decided over two years after the RICO case in this matter was filed, and it appears that the law was unclear before the Met-L-Wood case. Stone Pigman cannot be held liable for what the law was going to be in the future when the law was unclear at the time of filing of the RICO suit. The evidence is clear, that at the time Stone Pigman filed the RICO suit, they were reasonable in the approach that they took in the case, considering the unsettled state of the law at the time they filed the suit.
The contract between Hendrick and Stone Pigman was a contingency fee contract. The case was lost. Stone Pigman got no fees and Hendrick did not have to pay anything. Such is the nature of contingency fee contracts.
Accordingly, I feel that Stone Pigman was not guilty of any malpractice toward Hendrick under the circumstances of this case.
NOTES
[1] The record contains inconsistent evidence as to the actual date Stone, Pigman was retained as special counsel by the bankruptcy trustee to investigate the February 13, 1985 sale. However, the most reliable information indicates that the trustee petitioned the bankruptcy court on April 19, 1985, for authority to employ Stone, Pigman as special counsel to investigate the circumstances of the stock sale, and the bankruptcy court authorized the trustee to employ Stone, Pigman on May 24, 1985, dating back to April 29, 1985. Nevertheless, John Landis of Stone, Pigman testified that, although they had not yet been formally retained, they began working as special counsel to the trustee in March of 1985.
[2] Stone, Pigman sought a rehearing which was denied by this court. Stone, Pigman also applied to the Louisiana Supreme Court for supervisory and/or remedial writs, which the supreme court denied on June 5, 1998. Hendrick v. ABC Insurance Company, 98-1171 (La.6/5/98), 720 So.2d 689.
[3] Subsection B of La. R.S. 9:5605 specifically requires that all actions arising from an act, omission, or neglect occurring prior to September 7, 1990, must be filed on or before September 7, 1993. Since Reeder's claim arose on July 10, 1989, his action had to be filed by September 7, 1993, regardless of when he discovered he had a claim against North.
[4] Maltby v. Gauthier, 506 So.2d 1190 (La. 1987), addressed the question of whether La. R.S. 9:5628 operates to bar an action for damages caused by medical malpractice based on acts or omissions by health care providers which occurred prior to the effective date of the statute, when the action was not filed within the three years of the effective date. The Court concluded that "[i]nasmuch as there is no indication of any legislative intent, either expressed in the statute or implied from an analysis of the overall language and purpose of the statute, to affect claims based on acts or omissions occurring before the effective date of the statute," the statute did not bar the claim which arose prior to the statute's effective date. Maltby, 506 So.2d at 1191.
[5] La. C.C. arts. 2323 and 2324 were amended by 1996 La. 1st Ex.Sess., Act 3. The provisions are procedural in nature and, thus, are to be given retroactive application. Keith, 96-2075 at 7, 694 So.2d at 183.
[6] Mr. Smith testified that Al Collins was the "C" in PFC. Mr. Collins was one of the original stockholders who had been in litigation with the rest of the company arguing that they had "squeezed" him out of his stock ownership. He had alleged that his stock had been watered down. However, his suit settled prior to trial for about $850,000.00.
[7] Under the RICO Act, damages are trebled for a prevailing injured person and a reasonable attorney's fee is also recoverable. See 18 U.S.C. § 1964.
[8] Mr. Smith testified that Al Fink was the "F" and Seal Polk was the "P" of PFC.
[9] At trial, Mr. Steffes testified that he did not believe that it was his responsibility to file a Rule 60(b) motion on behalf of Hendrick because he was not retained to investigate or handle any kind of securities claim or file any kind of lawsuit against the purchasers of the stock. According to Mr. Steffes, it was Stone, Pigman's responsibility to investigate the matter and pursue any claims in connection with the stock sale.

Mr. Rubin testified at trial that he never considered appealing the order or filing a Rule 60(b) motion because there was no need. According to Mr. Rubin, they did not need to appeal because the court granted their application.
[10] The valuation was actually intended to be through February 28, 1985, which would be the end of their fiscal year.
[11] The following methodologies were examined: 1) break-up value, 2) book value multiple, 3) capitalization of earnings, 4) capitalization of cash flow, 5) capitalization of revenues, 6) discounted future cash flow, and 7) comparison to comparable type of transactions.