In the Matter of MET–L–WOOD CORPORATION, Debtor.

Appeal of Constantine John GEKAS, Trustee.

Constantine John GEKAS, Trustee, Plaintiff–Appellant,

v.

Frederick L. PIPIN, et al., Defendants–Appellees.

Nos. 87–3004, 88–1051.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 16, 1988.

Decided Nov. 8, 1988.

Constantine John Gekas, Harvitt & Gekas, Ltd., Chicago, Ill., for plaintiff-appellant.

Matthew F. Kennelly, Cotsirilos Crowley Stephenson Tighe & Streicker, Jeffrey C. Blumenthal, Foran, Wiss & Schultz, William Lynch Schaller, Francis D. Morrissey, William J. Linklater, Andrew J. Boling, Kathleen M. Dedmon, Baker & McKenzie, Chicago, Ill., for defendants-appellees.

Barry L. Kroll, Joseph M. Vallowe, C. Barry Montgomery, Williams & Montgomery, Ltd., Chicago, Ill., for Coffield, Ungaretti, Harris & Slavin.

Before CUMMINGS, POSNER, and MANION, Circuit Judges.

POSNER, Circuit Judge.

Constantine Gekas, the trustee in bankruptcy of Met–L–Wood Corporation, made sedulous but unavailing efforts in the bankruptcy court and the district court to set aside a judicial sale of the bankrupt's bulk assets, made before his appointment as trustee. He renews his efforts in this court.

A subsidiary of a corporation owned by Frederick Pipin, Met–L–Wood manufactured laminated panels, including the patented "Sea–Lok" door for truck trailers, which is designed to prevent leaks. In

1984 Met–L–Wood began going downhill, and on November 27 and 28 of that year its two principal secured creditors informed it that it was in default and that they would conduct a public foreclosure sale on December 10. On November 28, Met–L–Wood admitted it could not cure the default and agreed to so notify its unsecured creditors, which it did by letters mailed the same day. The forthcoming sale was advertised in the *Chicago Tribune* and the *Wall Street Journal* on December 2 and 5, while on December 3 Met–L–Wood sent letters to at least 40 of its creditors announcing the date, time, and place of the sale. On December 6, having learned that a group of its unsecured creditors were planning to petition it into bankruptcy and seek to liquidate it, Met–L–Wood filed a petition for protection under Chapter 11. The petition was assigned that day (by lot) to Bankruptcy Judge McCormick. Upon the filing of the petition, the automatic-stay provision of 11 U.S.C. § 362 had kicked in, preventing the secured creditors from proceeding with the scheduled foreclosure sale. Yet Met–L–Wood did not want to block the sale (why it wanted to beat the unsecured creditors to the bankruptcy court is therefore unclear). So the next day, Met–L–Wood, together with its principal secured creditors, asked Judge McCormick to allow them to solicit bids at the previously scheduled sale. The motion was hand-delivered to unsecured creditors holding approximately $1.8 million of Met–L–Wood's total unsecured debt of $2.2 million. Judge McCormick scheduled a hearing on the motion for the morning of December 10.

That morning Met–L–Wood's counsel, together with the principal secured creditors and a lawyer representing a committee of unsecured creditors who held a total of $1 million of the company's unsecured debt, appeared before Judge McCormick and urged him to grant the motion, which he did. Although the record is unclear on the point, presumably he was acting under the authority of 11 U.S.C. § 363(b)(1), which authorizes the trustee in bankruptcy (or, as was the case on December 10, the debtor in possession) to dispose of property of the bankrupt estate, other than in the ordinary course of business, "after notice and a hearing." Bids were solicited, received, and opened the same morning. The high bidder was Thomas Smith, acting as an undisclosed agent of Frederick Pipin. He bid $800,000 for the corporation's bulk assets plus its accounts receivable. Gerald Thompson bid $425,000 for the bulk assets alone. The unsecured creditors represented at the sale preferred Thompson's bid because they hoped that collection of the accounts receivable would yield enough money to leave something for them over and above the amount owed the secured creditors. The secured creditors agreed to the sale *to* Thompson and the next day urged Judge McCormick to approve it and he did. The accounts receivable when collected yielded a total of $800,000, but this amount plus the $425,000 that had been paid by Thompson for the bulk assets was barely sufficient to satisfy even the secured creditors' claims. The unsecured creditors were left to divide $100,000.

On June 26, 1985, six months after Judge McCormick had approved the sale, Met–L–Wood's Chapter 11 case was converted to a Chapter 7 liquidation on motion of the creditors' committee, which consisted of the eight unsecured creditors who had appeared through counsel at the hearings before Judge McCormick plus one additional unsecured creditor. Judge McCormick appointed an interim trustee pending the creditors' election of a permanent one. They elected Gekas on August 6. Gekas investigated the circumstances surrounding the judicial sale and eventually decided that there had been skullduggery of two kinds. First, Judge McCormick, who in an unrelated case had been reprimanded for an ex parte contact with a firm appearing before him (see *In re Wisconsin Steel Corp.*, 48 B.R. 753 (N.D.Ill.1985); see also *In re X–Cel, Inc.*, 61 B.R. 691 (N.D.Ill. 1986)), had, Gekas believed, agreed to the December 10 hearing on the ex parte urging of a law firm representing Met–L–Wood (the Coffield firm—oddly, not the firm that had represented Met–L–Wood in the bankruptcy proceeding). Gekas's second charge was that the bidding had been

rigged, in a scheme orchestrated by the Coffield firm to bail out Pipin and the secured creditors and leave the unsecured creditors out in the cold: Smith was a shill for Pipin, and his bid was phony because Pipin didn't have $800,000 with which to make good on it if it was accepted. How this might have helped Pipin and the secured creditors is unclear, but maybe the idea is that Smith's bid deterred others from bidding. Thompson, Gekas charged, was also in cahoots with Pipin—he was planning to sell him back the Sea–Lok operation, the only profitable part of Met–L–Wood's business. The unsecured creditors had insufficient notice and so weren't able to make their own bid or arrange for independent bidders. (We emphasize that all this is Gekas's version of the events; it is not established truth.) After the sale, Thompson did sell Pipin the Sea–Lok operation, for $120,000, and he in turn granted a security interest in the operation to Met–L–Wood's two principal secured creditors.

Armed with what he believed to be compelling evidence of the fraudulent character of the judicial sale, Gekas filed suit in federal district court against the corporation, Pipin, the Coffield firm, the two secured creditors, Thompson, and others, on April 25, 1986. The suit charged the defendants with having defrauded the unsecured creditors in violation of the RICO statute, other statutes, and Illinois common law. Three months later Gekas filed a motion in the bankruptcy court under Fed. R.Civ.P. 60(b) (which Bankruptcy Rule 9024 makes applicable to bankruptcy proceedings, with immaterial exceptions) to vacate the judgment confirming the judicial sale of Met–L–Wood's bulk assets. The bankruptcy judge dismissed the motion, noting that motions to vacate a judgment on grounds of fraud (Rule 60(b)(3)) must be filed within one year of the judgment. Gekas appealed, and the district judge affirmed. 80 B.R. 912 (N.D.Ill.1987). A different district judge dismissed the fraud suit. The ground for that dismissal was collateral estoppel, based on the order confirming the judicial sale. Gekas appeals both from the dismissal of his fraud suit by the district court and from the district

court's affirmance of the bankruptcy judge's dismissal of Gekas's Rule 60(b) motion.

█ Section 363 is a new provision of the Bankruptcy Code of 1978. Before then the bankruptcy court itself was conceived to be the seller when property of the bankrupt estate was sold. These judicial sales were subject to special rules and principles many of which are no longer pertinent. Under section 363, the trustee or debtor in possession is the seller and the bankruptcy court gets involved only through the requirement of notice and a hearing. Actually the statute fails to define the court's role clearly, but the practice is that the bankruptcy judge, following the hearing, will issue an order authorizing the sale (if he decides the property should indeed be sold), and after the sale is made he will issue a second order, confirming the sale. That was the procedure followed by Judge McCormick in this case. The confirmation order is appealable as a final order under 28 U.S.C. § 158(d). *In re Sax*, 796 F.2d 994, 996–97 (7th Cir.1986); *In re Allen*, 816 F.2d 325, 327 (7th Cir.1987). No appeal from Judge McCormick's order was taken, however; and after the time for appeal had lapsed, the order could not be attacked in a new lawsuit brought by a party to the sale proceeding or by a successor to that party or by anyone else so far identified with such a party as to be classified as being in privity with him; such a suit would be barred by res judicata. The only other remedy would be a motion to vacate the judgment under Rule 60(b). Cf. *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1232 (7th Cir.1986).

█ The unsecured creditors who appeared at the two hearings before Judge McCormick and urged him first to allow bids for Met–L–Wood's assets to be solicited and then to approve Thompson's bid were parties to the sale proceeding. They are therefore barred by res judicata from bringing a lawsuit to nullify the sale. (Bringing the suit under RICO could make no difference. RICO is many things, but it is not an exception to res judicata. *Harris Trust & Savings Bank v. Ellis*, 810 F.2d

700, 705–06 (7th Cir.1987).) If they comprised *all* the unsecured creditors, then Gekas's suit, too, would clearly be barred. The trustee in bankruptcy is the creditors' representative, *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1348–49 (7th Cir.1987), and therefore a judgment for or against the trustee is res judicata in a suit on the same claim by a creditor, provided no conflict of interest made the trustee's representation inadequate. See, e.g., *United States v. Schnick*, 66 B.R. 491, 494–95 (W.D.Mo.1986). The applicability of res judicata is even clearer in the converse situation—our situation—where the first suit is by the creditor and the second by the trustee. What the principal has surrendered, the agent cannot claim. See *In re Kendall Grove Joint Venture*, 59 B.R. 407, 409–10 (S.D.Fla. 1986). Gekas's contrary argument, asserting a metaphysical separation between the trustee and the creditors whom he represents, is frivolous; it would imply that no judicial order could be made binding in a bankruptcy case before a trustee was appointed—even though a trustee is usually not appointed in Chapter 11 cases, and was not in this one until the creditors decided to convert the proceeding from reorganization to liquidation. Creditors cannot exempt themselves from the consequences of their freely taken actions in a bankruptcy proceeding by the expedient of electing a trustee six months after the bankrupt's assets have been sold.

■ But not all the unsecured creditors were represented at the hearing that resulted in the sale to Thompson. Indeed, not all even had notice of the bankruptcy. Although all had notice before the petition for bankruptcy was filed that there was to be a foreclosure sale on December 10, the requirements for notice under section 363(b) were not met. See Bankruptcy Rules 2002, 6004(a). The trustee is their representative as well as the representative of the unsecured creditors who were parties to the sale proceeding, so insofar as Gekas's fraud suit is on their behalf too— that is, on behalf of nonparties to the sale proceeding—it is not barred by res judicata. But it is barred. A proceeding under section 363 is an *in rem* proceeding. It transfers property rights, and property rights are rights good against the world, not just against parties to a judgment or persons with notice of the proceeding.

■ We are not just invoking legal theories sanctified by Latin tags. The determining considerations are pragmatic. Often, once a petition for bankruptcy is filed, keeping the bankrupt in operation is difficult. Suppliers and customers, fearing interruption of service, may shy away and creditors be reluctant to advance fresh credit, even though such credit carries a high priority in bankruptcy. The bankrupt may be shunned like a leper. Because of these possible consequences of bankruptcy, it may make sense—not least from the creditors' standpoint—to shift the bankrupt's assets to another owner as quickly as possible, so that the business can continue in other hands than the bankrupt's, free of the stigma and uncertainty of bankruptcy. That is what the creditors told Judge McCormick should be done with the assets of Met–L–Wood. They thought that those assets and therefore their claims against them would be more valuable if the assets were sold, and sold pronto. He agreed. (On the issue when resort to section 363(b) is proper—a question on which the statute itself is silent—see *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir.1983).) Even Gekas does not question the propriety of selling the assets, although he questions the terms of the sale. But to act swiftly and decisively required that the sale of the assets be made and approved without waiting for every last unsecured creditor to be consulted. *All* of the unsecured creditors had been notified of the foreclosure sale; *most* (by volume of credit extended) had received notice of the bankruptcy; a committee of the principal unsecured creditors had participated actively through counsel in the two hearings before Judge McCormick and urged him to approve Thompson's bid. Since unsecured creditors are treated equally in bankruptcy (with certain exceptions, not pertinent here, for creditors who have received voidable preferences), it was a fair inference that if Thompson's bid was

in the best interest of the unsecured creditors represented before Judge McCormick, it was in the best interest of the remaining unsecured creditors as well.

A sale under section 363(b) that fails to comply with the notice or hearing requirements of the statute and the applicable bankruptcy rules is invalid and may be set aside on appeal. But it is not void. This is shown by the fact that even a reversal on appeal of the order authorizing or confirming the sale will not affect the sale's validity if the buyer was acting in good faith and the sale had not been stayed pending appeal. 11 U.S.C. § 363(m). That provision is not applicable here, because the purchaser (Thompson) and everyone else involved in the sale (except the representative of the unsecured creditors!) is charged with fraud. But it expresses a highly relevant concern with the importance of finality in judicial sales in bankruptcy. See also *In re Sax, supra,* 796 F.2d at 998. Gekas's suit does not seek to rescind the sale. But by seeking heavy damages from the seller, the purchaser, the purchaser's purchaser (Pipin), a law firm involved in the transaction, and the secured creditors that benefited from the sale, the suit is a thinly disguised collateral attack on the judgment confirming the sale. This may be done only by the route provided for collateral attacks on judgments. After the time for appeal had run, the validity of the sale was established, even against nonparties to the sale proceeding.

Gekas's suit was properly dismissed; let us now consider whether his motion under Rule 60(b) to revoke the bankruptcy judge's approval of the sale was properly denied. There is a preliminary question. Long before there was a Rule 60(b), bankruptcy courts exercised what they conceived to be, and what in fact has traditionally been regarded as, an inherent judicial power to reconsider their judgments within a reasonable time, including judgments confirming sales. See 4B Collier on Bankruptcy ¶ 70.98[17], at pp. 1183–94 (14th ed. 1978). Now that there is a Rule 60(b), expressly applicable to bankruptcy as we have seen, the inherent power

seems otiose; and although the cases continue to refer to it, they define it in terms of Rule 60(b). See, e.g., *In re Chung King, Inc.,* 753 F.2d 547, 549–50 (7th Cir. 1985). As a natural development from those cases, as well from the text of Bankruptcy Rule 9024, which applies Rule 60(b) to bankruptcy proceedings, we hold that confirmed sales—which are final judicial orders—can be set aside only under Rule 60(b). We conclude that the old inherent power to reconsider bankruptcy orders has been merged into the rule.

If a judgment is procured by fraud, it can be set aside under Rule 60(b)(3). But that route is barred to Gekas by the one-year limitation that Rule 60(b) places on motions under subsection (3). Gekas appeals to the catch-all provision, subsection (6) ("any *other* reason justifying relief from the operation of the judgment"), which has no time limit. We have italicized the word in subsection (6) that defeats Gekas's claim. You cannot use the catch-all provision to get around the express one-year limitation on motions based on fraud in procuring a judgment. Otherwise the limitation would be nugatory.

Rule 60(b) has, however, an express exception for "fraud upon the court." It has been, for the most part, interpreted narrowly. See, e.g., *In re Whitney–Forbes, Inc.,* 770 F.2d 692, 698 (7th Cir. 1985). Otherwise it would duplicate Rule 60(b)(3)—which is itself narrowly construed, see, e.g., *Metlyn Realty Corp. v. Esmark, Inc.,* 763 F.2d 826, 832–33 (7th Cir.1985). Therefore the courts have held that, other than in patent cases, where the "fraud upon the court" doctrine has been generously interpreted because Patent Office proceedings are ex parte and patent monopolies may have consequences far beyond the parties to a particular infringement proceeding, see, e.g., *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); *USM Corp. v. SPS Technologies, Inc.,* 694 F.2d 505, 509 (7th Cir.1982), the fraud must involve corruption of the judicial process itself. *In re Whitney–Forbes, Inc., supra,* 770 F.2d at 698; 11 Wright & Miller, Feder-

al Practice and Procedure § 2870, at p. 255 (1973).

 To bring himself within this narrow exception to the one-year limitation in Rule 60(b) Gekas relies heavily on the alleged misconduct by Judge McCormick in participating in an ex parte contact. If there was such a contact, however, all it concerned (so far as we have been given any reason to believe) was the scheduling of a hearing. Given the rush that everyone was in and the fact that bankruptcy proceedings are normally not adversary and are handled less formally than ordinary lawsuits, it is hard to see any but a technical violation of the rules that forbid (with limited exceptions not applicable here) ex parte contacts with bankruptcy judges. See, e.g., Bankr.R. 9003. The fact that Judge McCormick was found to have committed a serious infraction of those rules in an unrelated case cannot bridge the gap and demonstrate fraud in this case. Moreover, as we have stressed recently, a disciplinary violation calls for discipline, not nullification of judicial proceedings, see *Bash v. Firstmark Standard Life Ins. Co.*, 861 F.2d 159, 161, 162 (7th Cir.1988); for nullification there must be prejudice to a party, and none has been shown here.

 As for the allegations concerning the shill bidder and the secret plan to channel the Sea–Lok assets to Pipin (really one allegation—Pipin's secret involvement), we have difficulty understanding what the fuss is about. It is commonplace, and involves no impropriety, for the debtor himself to bid at a foreclosure sale. See 4B Collier, *supra,* ¶ 70.98 at p. 1170. Of course it would be improper for Pipin, controlling Met–L–Wood as he did, to use his control to walk off with its principal assets for a song, shucking off the unsecured creditors in the process. That would violate the fiduciary obligation that Pipin, controlling the debtor in possession, owed Met–L–Wood's creditors. See *In re Beck Industries, Inc.*, 605 F.2d 624, 635–37 (2d Cir.1979); cf. *In re Russo*, 762 F.2d 239 (2d Cir.1985); *In re Transcontinental Energy Corp.*, 683 F.2d 326, 328 (9th Cir.1982).

This would be fraud against the creditors, to be sure, but we do not see how it could be thought fraud against the court without erasing the distinction between two concepts that Rule 60(b) carefully separates. Gekas's Rule 60(b) motion was properly dismissed as untimely.

The result may seem a harsh one; it may seem to illustrate the penchant of courts (as some would see it) to work injustice through technicalities. But insistence on tight deadlines is not always the sign of a Prussian soul. Unless bankruptcy sales are final when made, rather than subject to being ripped open years later, high prices will not be offered for the assets of bankrupt firms—and the principal losers (pun intended) will be unsecured creditors. The unsecured creditors in this case had plenty of time to repent themselves of having consented to—indeed urged—approval of Thompson's bid. With the assets sold, there could be no hope of reorganizing Met–L–Wood; nevertheless the creditors waited six months before asking the bankruptcy judge to convert the proceeding to a liquidation and appoint an interim trustee, which the judge promptly did. The interim trustee did nothing. Gekas, though elected early in August, did not file his Rule 60(b) motion till the following July, almost a year later and months after he had completed his investigation. And, thorough though that investigation undoubtedly was, it has turned up nothing but rumor and innuendo. The fact that Pipin wanted to buy back some of the assets of his bankrupt enterprise is not discreditable, and there is no indication that the bulk assets were worth more than Thompson bid for them. In fact, Thompson outbid a third bidder who Gekas concedes was disinterested. The foreclosure sale, of which all unsecured creditors were notified, had been widely advertised for December 10; there is no indication that any of the defendants did anything to impede or discourage the bidding that day. The circumstances merely confirm the importance of finality in bankruptcy sales.

AFFIRMED.