# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

_____

06-6009/6010/6012/6013NE

_____

In re:                                               *
Brook Valley IV, Joint Venture;                      *
Brook Valley VII, Joint Venture                      *
                                                     *
    Debtors                       *
                                                     *
_____                    *
                                                     *
Rick D. Lange                                        *
                                                     *
    Plaintiff - Appellee/Cross-Appellant   *   Appeal from the United
                                                     *   States Bankruptcy Court
      vs.                *   for the District of Nebraska
                                                     *
Robert C. Schropp; Leo E. Dahlke;                    *
RCS & Sons, Inc.;                                    *
Phoenix Properties, LLC;                             *
Phoenix Properties of Brook Valley 1, LLC;           *
Phoenix Properties of Brook Valley 2, LLC;           *
R&L Valley Properties, LLC                           *
                                                     *
    Defendants - Appellants/       *
    Cross-Appellees                *
                                                     *
Jerry Slusky                                         *
                                                     *
    Defendant - Cross-Appellee     *
                                                     *
John Does, 1 through 20                              *
                                                     *
    Defendants                     *

_____

Submitted:  July 6, 2006
Filed:  August 15, 2006
_____

SCHERMER, FEDERMAN, and VENTERS, Bankruptcy Judges
_____

FEDERMAN, Bankruptcy Judge

This is an appeal and cross-appeal from a Judgment of the United States Bankruptcy Court for the District of Nebraska issued on February 3, 2006, in which the court granted judgment, awarded monetary damages, and imposed a constructive trust, in favor of the plaintiff, Rick D. Lange, the Chapter 7 Trustee (the "Trustee") of debtors Brook Valley IV, Joint Venture, and Brook Valley VII, Joint Venture ("Brook Valley" or "Debtors"), and against defendants Robert C. Schropp; Leo E. Dahlke; RCS & Sons, Inc.; Phoenix Properties, L.L.C.; Phoenix Properties of Brook Valley 1, L.L.C.; Phoenix Properties of Brook Valley 2, L.L.C.; and R&L Valley Properties, L.L.C. (the "Defendants").  We affirm in part, reverse in part, and remand for entry of judgment in accordance with this opinion.

## FACTUAL BACKGROUND

In this adversary proceeding, the Trustee contends that two insiders of the Debtors, Robert Schropp and Leo Dahlke, formed a corporation, Phoenix Properties, L.L.C., to secretly purchase the Brook Valley buildings after they caused the Debtors to consent to a foreclosure of the buildings, and further that these two individuals made an express misrepresentation to the court denying they had done so.  We will deal with these issues *seriatim.*

2

I.  The Events Leading up to the Debtors' Bankruptcy Filing and Foreclosure

Schropp and Dahlke were partners in thirteen commercial real estate partnerships with Prime Realty, Inc., an entity solely owned and controlled by James McCart.  (Hereafter, McCart and Prime Realty are collectively referred to as "Prime Realty.")  Brook Valley IV and Brook Valley VII, the Debtors herein, were two of the single-asset commercial real estate partnerships owned by Schropp, Dahlke, and Prime Realty.  In the fall of 2001, Schropp and Dahlke had a falling out with Prime Realty. In September 2001, Prime Realty filed suit in Nebraska state court to dissolve the 13 partnerships, including the two Brook Valley partnerships.  Throughout 2001 and 2002, several of the properties owned by Schropp, Dahlke, and Prime Realty were foreclosed by the lenders, with the partners and their lenders losing substantial sums of money.  Prime Realty filed for Chapter 11 protection in March 2002.

The Brook Valley buildings were encumbered by first Deeds of Trust to First National Bank of Omaha.  The Brook Valley properties were also allegedly encumbered by liens held by Darland Construction Company and Prime Realty, although the validity of those liens is subject to dispute.  Schropp and Dahlke had personally guaranteed at least the First National Bank debt, and, perhaps, the Darland Construction debt as well.

By the spring of 2002, construction on the Brook Valley buildings was substantially completed and the buildings were partially occupied by tenants. Although the Debtors were servicing their debts on these properties and meeting their operating expenses, the loans on the two buildings became due on April 1 and June 1, 2002, respectively, and First National Bank would not forbear or convert the construction loans to long-term loans.  Consequently, Schropp and Dahlke authorized the filing of Chapter 11 Petitions for the two Brook Valley partnerships on April 2, 2002.    Because Prime Realty had dissociated itself from the Brook Valley

3

partnerships, Prime Realty was not involved in the filing of the bankruptcy petitions.[1] After the petitions were filed, the Debtors acted as debtors-in-possession under the exclusive control of Schropp and Dahlke until June 2004, when the cases were converted to Chapter 7 and the Plaintiff was appointed as Trustee.

Seventeen days after filing the Debtors' bankruptcy cases, Schropp and Dahlke, on behalf of the Debtors, agreed with First National Bank that the automatic stay should be lifted to permit First National Bank to commence foreclosure proceedings, and they filed stipulated motions for relief. The bankruptcy court entered orders approving the stipulations on May 17, 2002. Although Prime Realty did not originally protest the stipulated motions, Prime Realty requested the court to reconsider the orders approving the stipulations, asserting that the buildings had equity and the rents were sufficient to service the debt. Prime Realty also requested that a trustee be appointed. Prime Realty's requests were denied, and Prime Realty did not appeal those orders. However, Prime Realty requested and received authorization from the court to incur debt in order to pay off First National Bank and stop the foreclosure sale, which was set for September 24, 2002. Apparently, however, Prime Realty was unable to obtain appropriate financing before the sale, so the court allowed the foreclosure sale to proceed as scheduled. Phoenix Properties, LLC, an entity formed by Schropp and Dahlke not long after they filed the Debtors' bankruptcy cases and just before the foreclosure sale, was the successful bidder at the sale.

## II. The Formation of Phoenix Properties, L.L.C.

Originally, a group comprised of Schropp, Dahlke, and some of Darland Construction's principals planned to form a new entity and arrange financing to

---

[1] At one point, the question of whether Schropp and Dahlke had the authority to file the petitions without Prime Realty's authorization was at issue. While Defendants argue in their brief that they did have such authority, the Plaintiff does not disagree, so we need not address that issue.

participate in the bidding at the foreclosure sale. In the week before the sale, however, the Darland principals withdrew from the group. Nevertheless, Schropp and Dahlke formed Phoenix Properties, L.L.C. The partners in Phoenix Properties were RCS & Sons, Inc. (an entity controlled by Schropp) and Dahlke. Once formed, Phoenix Properties obtained financing from Great Western Bank sufficient to cover the bulk of the First National Bank liens. And, after Darland Construction dropped out of the formation of the new partnership, Schropp and Dahlke arranged for an additional $600,000 in financing from an entity referred to as "Phoenix Brook Valley Re-Cap," and paid Darland Construction $300,000 for an assignment of Darland's rights under its alleged second lien position.

After the foreclosure sale, Phoenix Properties became the owner of the Brook Valley properties; Great Western held the first liens; and Phoenix Brook Valley Re-Cap held second liens. Prime Realty's alleged lien was wiped out. Phoenix Properties, and the subsidiaries they formed to operate and manage the properties, (Defendants Phoenix Properties of Brook Valley 1, LLC and Phoenix Properties of Brook Valley 2, LLC) were at all times controlled by Schropp and Dahlke.

At the time of the foreclosure sale, Schropp and Dahlke had appraisals showing combined values of $2,480,000 - $3,700,000, meaning that the equity after payment of First National's debt would have been between $415,724 and $1,635,724. Great Western, which financed Phoenix's purchase, appraised the properties at a total of $3,310,105, again showing substantial equity.

III. The Foreclosure Sale

Although at least one other bidder submitted a bid at the September 24, 2002 foreclosure sale, Phoenix Properties was the successful bidder, paying $1,467,000 for the Brook Valley IV property, and $939,430 for Brook Valley VII. After satisfying the First National Bank liens and paying approximately $135,000 for unpaid special

assessments, the sale should have produced a surplus of $146,862.35 on the Brook Valley IV property, possibly subject to the disputed Darland Construction and Prime Realty liens. Pursuant to the bankruptcy court's orders, which Schropp and Dahlke acknowledged at the time, anyone other than First National Bank making a bid was to pay the purchase price in cash, and any surplus over First National's debt was expressly required to be turned over to the court pending a determination of the validity and priority of the Darland and Prime Realty liens. In contravention of these requirements, and contrary to counsel's post-foreclosure representations made to the court that the surplus was being held and would be turned over, Phoenix Properties, which had acquired Darland's lien position, purportedly "credit bid" that amount against the Darland lien and did not pay that part of the purchase price in cash. Thus, the Debtors, through Schropp and Dahlke, never turned over the surplus, despite court orders to do so and representations that they would.

After the sale, Phoenix Properties and its subsidiaries, all of which are controlled by Schropp and Dahlke, took over control of the management and operations of the two Brook Valley properties.

IV. The Post-Foreclosure Events

Sometime in November of 2002, Prime Realty discovered that Schropp and Dahlke owned Phoenix Properties. On November 21, 2002, Prime Realty filed a motion requesting, as relevant here, that a trustee be appointed, and that Schropp and Dahlke be required to account for all post-petition financial activities of the Debtors. In such motion, Prime Realty contended that Phoenix Properties was owned by Schropp and Dahlke. The Debtors objected to the motion, saying:

> Great Western Bank entered into a transaction with Phoenix Properties, LLC. Phoenix Properties, LLC also *apparently* entered into a transaction with Phoenix Brook Valley Re-Cap, LLC. The purpose of both transactions was *apparently* to provide financing to Phoenix Properties

6

to allow it to bid at the trust deed foreclosure sale conducted by the First National Bank of Omaha. *Both of these transactions and the supporting documents were entered into between parties who are not parties to this bankruptcy proceeding.* Those private transactions which *apparently* provided the financial resources for Phoenix Properties, LLC to bid on and buy the real estate being sold at public auction *have nothing to do with this bankruptcy case.* (Emphasis added.)

Based in part on this response, the bankruptcy court denied Prime Realty's motion for appointment of a trustee.[2]

Meanwhile, Schropp and Dahlke, through Phoenix Properties, continued to operate and manage the Brook Valley properties. They operated at a profit.

On June 10, 2004, with essentially all of their assets having been sold, the Debtors' cases were voluntarily converted to Chapter 7, and the Plaintiff was appointed Trustee.

After the case was converted, the Trustee requested that the Debtors turn over the $146,862.35 in surplus sale proceeds on the Brook Valley IV property. Debtors' counsel responded that Darland had held a second lien on Brook Valley IV and that Phoenix Properties had purchased the Darland lien and credit bid the amount in excess of the first lien. "There was no doubt that Darland was in second position," they said. However, as mentioned above, the alleged credit bid was in contravention of the court's requirement that any bidder except First National pay in cash, with the excess

---

[2] After later learning of the true relationship between Schropp, Dahlke, and Phoenix Properties, and of their attorneys' role in all of this, the bankruptcy court ordered counsel who made such misrepresentations to show cause why they should not be sanctioned for their actions "which benefitted only Mr. Schropp and Mr. Dahlke, but not the debtors." (App. at 108).

7

over First National's debt to be paid into the court pending resolution of the validity and priority of the liens.[3]

After investigating Schropp and Dahlke's handling of the estates of the debtors-in-possession, the Trustee filed this adversary proceeding against Schropp and Dahlke, and their various entities, asserting breach of fiduciary duties and conversion, and requesting reconveyance of the properties and an accounting. Essentially, the Trustee contends that there was substantial equity in the properties, and that Schropp and Dahlke had a fiduciary obligation to preserve that equity for the benefit of creditors. Instead of preserving that equity, the Trustee alleges, Schropp and Dahlke immediately consented to a foreclosure of the properties, secretly purchased them at the sale, and then made an express misrepresentation to the Court denying that they had done so. After the adversary proceeding was filed, the parties agreed that the properties could be sold by Phoenix Properties, with the net proceeds to be held in the court registry pending a final determination as to who is entitled to them. The sales occurred in 2005. After satisfaction of the liens held by Great Western and Brook Valley Re-Cap LLC, and sale expenses, there remained net sale proceeds of $488,453.95 for Brook Valley IV, and $377,485 for Brook Valley VII, which are on deposit with the registry of the court.

On February 3, 2006, the bankruptcy court issued a Judgment and Memorandum Order finding that the properties were still part of the Debtors' bankruptcy estates at the time of the foreclosure sale and that Schropp and Dahlke breached their fiduciary duties in purchasing the properties, and in not properly reporting the terms of sale. The court therefore imposed a constructive trust on the sale proceeds, meaning that they would be paid to the trustee. The court also found that Schropp and Dahlke had converted $146,862.35, representing the proceeds bid

_____

[3] Although they initially resisted the Trustee's request to turn over the surplus, the Defendants now concede that they were required to turn it over. They do not appeal from the part of the court's Judgment requiring them to turn over those funds.

8

for the Darland Construction lien at the foreclosure sale. However, the court held that they would not be required to repay such amount if they consented to payment of the sales proceeds to the Trustee, in the total amount of $865,938.95. And, the court also held that the net cash flow received by the Debtors from the date of the bankruptcy petition, April 2, 2002, until the date of the foreclosure sale, September 24, 2002, totaling $86,581.32, was property of the estate. Once again, the court held that it would not require repayment of such funds by Schropp and Dahlke if they consented to payment of the sales proceeds to the Trustee. Finally, the Court held that the evidence was insufficient to establish the net cash flow received by Phoenix Properties after the foreclosure sale on September 24, 2002, and prior to its sale of the properties in 2005. Therefore, the Trustee was not allowed to recover any damages for income received from the properties by Phoenix Properties. By separate order, the court also ordered the attorneys representing the Debtors, Schropp, and Dahlke to submit declarations or affidavits explaining their actions in the case, and explaining why they should not be sanctioned for their conduct. The court's ruling on that issue remains pending.

The Defendants appeal from the court's judgment, and the Trustee cross-appeals as to the amount of damages awarded.

STANDARD OF REVIEW

A bankruptcy appellate panel shall not set aside findings of fact unless clearly erroneous, giving due regard to the opportunity of the bankruptcy court to judge the

9

credibility of the witnesses.[4] We review the legal conclusions of the bankruptcy court *de novo*.[5]

## DISCUSSION

I. <u>The Trustee's Action is Not a Collateral Attack on Final Orders of the Bankruptcy Court</u>

The Defendants first contend that the claims asserted by the Trustee in this action are collateral attacks on final orders of the bankruptcy court, and are therefore barred by collateral estoppel or *res judicata*. As stated, on May 17, 2002, the bankruptcy court entered an order lifting the automatic stay, with the consent of Schropp and Dahlke in their capacity as principals of the debtors-in-possession. Thereafter, on May 23, 2002, Prime Realty moved for reconsideration of the order, contending that there was equity in the properties. Upon the denial of the motion, the properties were foreclosed, without the involvement of the bankruptcy court. Later, on November 22, 2002, Prime Realty, having discovered that Schropp and Dahlke had formed Phoenix and used it as a vehicle to buy the property at the foreclosure sale, asked that a trustee be appointed and that the debtors-in-possession be required to account for all postpetition financial activities. After Schropp and Dahlke responded by specifically denying any involvement in Phoenix, that motion was denied. The Defendants contend that the rulings on these three motions bar the Trustee's suit here.

---

[4]*Gourley v. Usery (In re Usery),* 123 F.3d 1089, 1093 (8th Cir. 1997); *O'Neal v. Southwest Mo. Bank (In re Broadview Lumber Co., Inc.)*, 118 F.3d 1246, 1250 (8th Cir. 1997) (citing *First Nat'l Bank of Olathe v. Pontow*, 111 F.3d 604, 609 (8th Cir.1997)). Fed. R. Bankr. P. 8013.

[5]*First Nat'l Bank of Olathe v. Pontow (In re Pontow),* 111 F.3d 604, 609 (8th Cir. 1997); *Sholdan v. Dietz (In re Sholdan),* 108 F.3d 886, 888 (8th Cir. 1997).

10

The cases primarily relied on by the Defendants concern the finality of court-approved sales of property. In *Regions Bank v. J.R. Oil Co., LLC*,[6] a lender contended that a bankruptcy court order approving a sale of estate assets had been obtained improperly due to alleged RICO violations by the debtor and others. The Eighth Circuit held that once a sale of assets is approved by a final order of the bankruptcy court, that judgment is shielded from collateral attack:

> The bankruptcy court...approved the sale and found the sale to be in good faith, for fair value, and in the best interest of [the debtor] and its creditors. A bankruptcy sale under 11 U.S.C. § 363, free and clear of all liens, is a judgment that is good against the world, not merely as against parties to the proceeding.[7]

The Eighth Circuit in *Regions Bank* relied in part on the decision of the Seventh Circuit in *In re Met-L-Wood Corp.*[8] There, the trustee attempted to set aside a judicially-authorized § 363 sale, claiming that the sale was rigged, that a shill bidder for an officer of the debtor was involved, and that there was inadequate consideration. The trustee also sought damages for fraud against the parties to the conspiracy. In ruling against the trustee, the Court held that the case amounted to an impermissible collateral attack on the order authorizing the sale. If a creditor or trustee discovered that a sale order had been obtained fraudulently, the Court held, a motion to set aside the sale must comply with the requirements of Rule 60(b), as made applicable in bankruptcy cases by Bankruptcy Rule 9024. Ordinarily, such a motion would be required to be filed within one year after entry of the order approving the sale.[9] However, as the Seventh Circuit noted, there is an express exception to the time

---

[6] 387 F.3d 721 (8th Cir. 2004).

[7] *Id.* at 732.

[8] *Gekas v. Pipin (In re Met-L-Wood Corp.)*, 861 F.2d 1012 (7th Cir. 1988).

[9] *Id.* at 1018.

11

limitation for "fraud upon the court."[10]  Here, Prime Realty did, within one year after the order lifting the stay, discover that Schropp and Dahlke were the owners of Phoenix, and that such ownership interest had not been disclosed.  Therefore, they filed the November 22, 2002 motion.  That motion was denied, but only after Schropp and Dahlke falsely represented to the Court that they had no ownership interest in Phoenix.  That response constitutes a fraud upon the court.

This is an action for breach of fiduciary duties.  Since the sale of the property to Phoenix was never subject to approval by the bankruptcy court, this is not a suit to set aside such sale.  Instead, it is a suit to recover funds which would have been available to creditors had Schropp and Dahlke acted in the best interests of creditors, rather than their own.  In bankruptcy cases in this Circuit, "the principle of *res judicata* should be invoked only after careful inquiry because it blocks 'unexplored paths that may lead to truth.'"[11]  Here, it was the actions of Schropp and Dahlke, in misrepresenting their ownership of Phoenix Properties, which prevented the court from learning the truth at the time it ruled on the prior motions.  Therefore, the orders allowing the bank to foreclose, and refusing to appoint a trustee, do not serve to bar the relief sought by the Trustee.

II.  The Brook Valley Buildings Were Property of the Debtors' Bankruptcy Estates

The Defendants assert that the Brook Valley properties were no longer property of the Debtors' bankruptcy estates when the Defendants purchased them at the foreclosure sale.  The bankruptcy court found that they were, and we agree.

> When a bankruptcy court lifts, or modifies, the automatic stay, it merely removes or modifies the injunction prohibiting collection actions against

---

[10] *Id.*

[11] *In re Ladd,* 450 F.3d 751, 755 (8th Cir. 2006) (citations omitted).

12

the debtor or the debtor's property. Although the property may pass from the control of the estate, that does not mean that the estate's interest in the property is extinguished. . . . Relief from an automatic stay entitles the creditor to realize its security interest. . . in the property, but all proceeds in excess of the creditor's interest must be returned to the trustee. . . . Thus, an order lifting the automatic stay by itself does not release the estate's interest in the property and the act of lifting the automatic stay is not analogous to an abandonment of the property.[12]

To hold otherwise would repudiate the express language of § 554.[13]  Accordingly, because the bankruptcy court only granted relief from the stay to permit First National Bank to conduct a foreclosure sale, but did not order an abandonment of the Brook Valley properties, the Debtors retained their rights in those properties after the stay was lifted and up until the buildings were sold. Under bankruptcy law, the buildings were property of the Debtors' estates when the foreclosure sale was conducted.

The Defendants assert, nevertheless, that under Nebraska law, where a notice of default is given and the thirty-day cure period passes, a borrower has no further right to cure and loses all interest in the property.[14] Further, they point out, Nebraska law does not provide a right of redemption.[15] Thus, the Defendants assert, by the time of the foreclosure sale, the bankruptcy notwithstanding, the Debtors had lost all interest in the Brook Valley properties under Nebraska law.

We agree that, under Nebraska law, notice of default and failure to cure causes the borrower to lose the right to bring the note current and reinstate the deed of trust

---

[12] *Catalano v. Comm'r of Internal Revenue*, 279 F.3d 682, 686-87 (9th Cir. 2002) (citations and internal quote marks omitted). *But see In re Griggs*, 82 B.R. 532 (W.D. Mo. 1988).

[13] *Id.* at 686.

[14] Neb. Rev. Stat. § 76-1012.

[15] Neb. Rev. Stat. § 76-1010(2).

as if no default had occurred. Nevertheless, as the bankruptcy court held, until the property is actually sold at foreclosure, the borrower still owns the property and may pay the note in full, thereby causing a release of the deed of trust lien and the borrower's retaining all ownership rights.[16]

The Defendants argue that the Debtors had no interest in the property at the time of the foreclosure sale because they were unable to pay the note in full. However, there was no specific testimony or substantiated evidence that the Defendants attempted in good faith to obtain financing from other lenders on behalf of the Debtors.[17] Indeed, the Trustee alleges that, instead of attempting to obtain such financing to pay off the bank, Schropp and Dahlke sought financing to allow them to purchase the property for themselves, not to preserve its value for the estate and its creditors. More importantly, however, this point is irrelevant: the *likelihood* of the Debtors' being able to exercise their right to pay the notes in full does not eliminate their actual *right to do so.* The Debtors, therefore, still had ownership rights in the building up to the foreclosure sale under Nebraska law.

---

[16] *See Butts v. Hale*, 59 N.W.2d 583, 586-87 (Neb. 1953) (holding that every interest and right held by a mortgagor, whenever acquired, pass with the mortgage at a foreclosure sale). The case relied on by the Defendants, *In re Jones*, 214 B.R. 492 (Bankr. D. Neb. 1997), actually supports the bankruptcy court's decision on this point. In that case, the trustee's sale had occurred before the debtors filed their bankruptcy petition and the debtors sought to have it set aside. The court in that case held that, "*after the sale was conducted*, all of debtors' ownership rights were extinguished under Nebraska law." *Id*. at 493 (emphasis added).

[17] Schropp testified in deposition that they had made no attempts to obtain financing on behalf of the Debtors. At trial, when confronted with that deposition testimony, Schropp and Dahlke testified, generally, that they had made attempts on behalf of the Debtor, but gave no specifics, nor did they mention any specific lenders from whom they sought financing on the Debtors' behalf. Similarly, the real estate consultant from whom they sought advice when the partnerships were failing (who was also an investor in Phoenix Brook Valley Re-Cap) testified generally about attempts to obtain new financing for the Debtors and named some lenders, but he also testified he was working for the individuals, rather than the Debtors. All of the witnesses testified they made no efforts to market or sell the properties.

14

III.    Breach of Fiduciary Duties

The Trustee asserts that the Defendants, while acting as debtors-in-possession, breached their fiduciary duty to the estate and its creditors. Debtors-in-possession, and those persons in control of them, have a fiduciary duty to the bankruptcy estate and the debtor's unsecured creditors:  "The United States Supreme Court has made clear that a debtor in possession, like a chapter 11 trustee, owes the estate and its creditors a general duty of loyalty."[18]  "[I]n practice these fiduciary responsibilities fall not upon the inanimate corporation, but upon the officers and managing employees who must conduct the Debtor's affairs under the surveillance of the court."[19]  The same is true in the case of debtor partnerships.[20]  Chapter 11 cases are filed on behalf of such businesses in order to preserve and protect their assets through reorganization, or in order to effect an orderly liquidation of such assets.  In either case, the goal of Chapter 11 is to maximize the value of money and property available for distribution to creditors.  A person in charge of a business in Chapter 11, whether acting as a trustee or as a debtor-in-possession, is obligated to use best efforts to so maximize the value

---

[18]  *In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 361 (Bankr. S.D. N.Y. 2001) (citing *Wolf v. Weinstein*, 372 U.S. 633, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963)).  *See also Fulton State Bank v. Schipper (In re Schipper),*109 B.R. 832, 835 (Bankr. N.D. Ill. 1989) ("[a] debtor-in-possession holds its powers in trust for the benefit of the creditors and has the duty to protect and conserve property in his possession for their benefit"), *aff'd* 933 F.2d 513 (7th Cir. 1991); *In re Intermagnetics America, Inc.*, 926 F.2d 912, 917 (9th Cir. 1991) ("[o]fficers of a debtor-in-possession are officers of the court because of their responsibility to act in the best interests of the estate as a whole and the accompanying fiduciary duties."); *Ramette v. Bame (In re Bame)*, 251 B.R. 367, 373 (Bankr. D. Minn. 2000) ("it is clear that a DIP has a duty to creditors of the estate not to waste the estate's assets"); *In re Q.P.S., Inc.,* 99 B.R. 843, 845 (Bankr. W.D. Tenn. 1989) (holding that a Chapter 11 debtor-in-possession is a fiduciary); *In re Modern Office Supply*, 28 B.R. 943, 944 (Bankr. W.D. Okla. 1983) (holding that creditors have the right to require the debtor-in-possession to exercise their fiduciary powers for their benefit).

[19]  *In re Hampton Hotel Investors*, 270 B.R. at 361 n. 35 (quoting *Wolf v. Weinstein*, 372 U.S. at 649, 550, 83 S.Ct. 969)).

[20]  *Id.* at 361.

15

of the debtor's estate.[21] That does not mean that such person is responsible solely because the debtor-in-possession fails or because, in hindsight, such person could have made better decisions. As is true outside of bankruptcy, courts do not ordinarily second-guess decisions made by the person in charge of a business if they are attributable to a rational business purpose. However, where bad faith, self-interest, or gross negligence are shown, such person is liable for the resulting damages.[22]

We agree with the bankruptcy court that Schropp and Dahlke breached their fiduciary duties to the Debtors' estates continuously throughout this case, beginning when they stipulated to the relief from stay to protect their personal interests. The breach of fiduciary duty continued when they secretly bought the buildings at the foreclosure sale, when they expressly misrepresented to the court their having done so, when they failed to account for or turn over the foreclosure surplus amount, and when they failed to turn over the operating profits received from the Debtors' properties.

As mentioned above, the Debtors, through Schropp and Dahlke, stipulated to the relief from stay only seventeen days after filing the bankruptcy petitions, thereby at least implicitly representing to the court that they believed foreclosure to be in the best interests of the Debtors' estates. By making this representation to the court, Schropp and Dahlke were, in effect, stating to the court that the properties had no equity and would not otherwise be profitable or produce funds for the estates. Indeed, in denying the motion of Prime Realty to reconsider the stay lift order, the bankruptcy court stated that "the majority owners of the debtor believe it is appropriate to permit the bank to foreclose."[23]

---

[21] *See In re Apex Oil Co.,* 92 B.R. 847 (Bankr. E.D. Mo. 1988).

[22] *See, e.g., In re Integrated Resources, Inc.,* 147 B.R. 650, 656 (S.D. N.Y. 1992). (citations omitted).

[23] App. at 175-76.

However, that was not the case. The Debtors listed these properties in their schedules as having substantial equity, showing only the First National Bank liens as being undisputed. All other liens, including the Darland and Prime Realty liens, were identified in the schedules as being unliquidated and disputed. In addition, as it turns out, the properties did produce a consistent stream of net income after the bankruptcy case was filed, both pre-foreclosure and post-foreclosure. And, the Defendants had appraisals dated April 19, 2002, which was the same date the stipulated motions for relief from stay were filed, showing substantial equity.

But, these appraisals were not given to the court until later and, more importantly, what the bankruptcy court was completely unaware of during all of this, including the later proceedings instigated by Prime Realty, was that, contrary to their actual and implied representations to the court, Schropp and Dahlke were not looking after the best interests of the Debtors' estates – they have admitted, and the bankruptcy court subsequently found, that their primary goal from the beginning was to protect themselves from personal liability on their guaranties. As events have unfolded, it became evident they had another goal that was hidden from the bankruptcy court at the time: to obtain financing on their own behalf and buy the properties at the foreclosure sale in the hopes of making a profit. As insiders of the debtors-in-possession, instead of searching for financing to support their *own* purchase of the buildings, Schropp and Dahlke should have been making efforts to obtain financing on behalf of the *Debtors* to salvage the properties. There was no specific or substantiated evidence submitted as to any efforts made to obtain financing on behalf of the Debtors; rather, the evidence suggests that they merely tried to convince First National Bank to forbear or refinance and, when First National refused, they worked out an agreement to have the stay lifted. At that point, Schropp and Dahlke started looking for financing on their own behalf, without advising the court. The Defendants' assertions, even now, that they believed the buildings had no equity and were not profitable, are belied by the fact that they rallied to find financing to help

17

them purchase the properties for their own benefit at the foreclosure sale. As it turns out, the buildings were profitable and did have equity.

We do not suggest that a debtor-in-possession's mere consent to relief from stay, even where the property has some equity or ongoing value, is a breach of fiduciary duties. There may well be a valid business reason not to fight such a motion. It is the consent to relief, combined with their secret efforts to buy the properties out from under the estates they were responsible to preserve, which creates the fiduciary violation here. As the Seventh Circuit noted in *Met-L-Wood Corp.,* "[i]t is commonplace, and involves no impropriety, for the debtor himself to bid at a foreclosure sale. . . . Of course, it would be improper for Pipin [the owner], controlling Met-L-Wood as he did, to use his control to walk off with its principal assets for a song, shucking off the unsecured creditors in the process. That would violate the fiduciary obligation that Pipin, controlling the debtor-in-possession, owed Met-L-Wood's creditors."[24] When asked at oral argument who was there to protect the interests of the estate in this case, counsel for the Defendants responded that Prime Realty was, through its motions to reconsider the order lifting the stay and to set aside the sale. But, it was not Prime Realty's duty to assume that role: it was Schropp's and Dahlke's. And they not only failed in that duty, they actively concealed facts, leaving the court unaware that they were, in fact, not looking out for the best interests of the estate and its creditors.

Relying primarily on the case of *In re Rahe*,[25] the bankruptcy court held that trustees and debtors-in-possession are *per se* prohibited from purchasing property of the bankruptcy estate. The *In re Rahe* court noted that the Federal Criminal Code provides for a fine and forfeiture of office for a person who, being a custodian, trustee, marshal, or other officer of the court, "knowingly purchases, directly or indirectly, any

---

[24] 861 F.2d at 1019.

[25] 178 B.R. 801 (Bankr. D. Neb. 1995).

18

property of the estate of which the person is such an officer in a [bankruptcy] case," and cited cases applying the prohibition against purchasing estate assets in the bankruptcy case itself.[26] The court here held that this prohibition applies no matter what chapter and no matter what the facts concerning the transaction are.

Thus, the court held that Schropp and Dahlke, as persons who controlled the debtors-in possession, were absolutely prohibited from purchasing the Brook Valley properties, either directly or indirectly through Phoenix Properties.

Although we recognize the potential problems inherent in such situations, we are reluctant to adopt a *per se* rule prohibiting debtors-in-possession or their insiders from purchasing property of a debtor's bankruptcy estate. The existence of a fiduciary duty is without much debate, but the issue of whether a purchase of estate assets by such person violates that duty is the subject of some debate.[27]

As did the bankruptcy court in this case, some courts have held that the purchase of assets of the estate by a person in charge of such estate is, necessarily, a breach of fiduciary duty and absolutely prohibited.[28] However, with due deference to

---

[26] *Id*. at 802 (citing 18 U.S.C. § 154; *In re Frazin & Oppenheim*, 181 F. 307, 309 (2d Cir. 1910; *In re Q.P.S., Inc.*, 88 B.R. at 845)).

[27] *See In re Bame*, 251 B.R. at 373 ("[w]hile the exact scope of a DIP's fiduciary duties is subject to some debate, it is clear that a DIP has a duty to creditors of the estate not to waste the estate's assets"*); In re Schipper,*109 B.R. at 835 (the scope of the duty is somewhat undefined).

[28] *See e.g., In re Rahe*, 178 B.R. 801 (Bankr. D. Neb. 1995); *In re Q.P.S., Inc.*, 99 B.R. 843 (Bankr. W.D. Tenn. 1989) ("[r]egardless of whether the trustee or the trustee's agent and/or employee in fact profits from the transaction at the expense of the estate, neither a bankruptcy trustee nor his agents and/or employees may purchase properties of the estate, even for a *fair* price" (emphasis in original.)); *In re Lowry Graphics, Inc.*, 86 B.R. 74 (Bankr. S.D. Tex. 1988) ("[r]egardless of whether [the trustee and the trustee's agent] in fact profited from this transaction at the expense of the estate, neither a bankruptcy trustee nor his agents may purchase or self deal in assets of the estate, even for a 'fair' price"); *In re Donovan & Schuenke*, 226 F.2d 804 (9th Cir. 1955) ("Even if there were full disclosure, adequacy of consideration, absence of

those courts, and recognizing the inherent dangers of self-dealing in a fiduciary relationship, we agree with those courts holding that engaging in these transactions does not constitute a *per se* violation of fiduciary obligations: "Rather, the fiduciary need only prove that the transaction was inherently fair. The essence of the fairness test is whether or not under the circumstances the transaction carries the earmarks of an arm's length bargain."[29]

"[B]ankruptcy law does not necessarily prohibit a debtor from purchasing property from its own bankruptcy estate either directly, or through an alter ego. Rather, a sale of a bankruptcy estate's property outside the ordinary course of business hinges solely upon whether the sale would be in the estate's best interests."[30] The important factor in such situations is that the sale be fully disclosed and that vigorous, arms-length, good faith negotiations take place.[31]

Here, however, there was neither full disclosure nor independent oversight of the transaction. Indeed, the Defendants in this case actively concealed the identity of Phoenix Properties and the facts surrounding the insider deal, both before and after the sale took place. In sum, while we decline to adopt a *per se* rule, we agree with the bankruptcy court that Schropp and Dahlke breached their fiduciary duties by first consenting to relief from the stay and then purchasing the properties at the foreclosure sale without disclosure to the court.

---

secret profit, an open judicial sale will not avail separately or in combination as a defense for such a fiduciary. The prohibition is absolute in the public interest. It is established to protect the courts themselves from suspicion of chicanery.").

[29] *In re Schipper,* 109 B.R. at 835-36 (citations omitted)

[30] *Grass Lake All Seasons Resort, Inc*., 2005 WL 2095890 at *7 (E.D. Mich. 2005) (citations omitted).

[31] *In re Apex Oil*, 92 B.R. at 847,869, 870 (holding that an insider may buy assets of a debtor if there are arms-length, good faith negotiations with full disclosure); *see also In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 842 (Bankr. C.D. Cal. 1991).

IV.     The Remedy

        The bankruptcy court entered judgment against the defendants as follows: First, it found that Schropp and Dahlke had converted the $146,862.35 in surplus proceeds from the foreclosure sale that were never turned over.  And, it found that the $86,581.32 pre-foreclosure net cash flow from the two Brook Valley properties was property of the bankruptcy estate. The defendants concede that both these amounts are due the Trustee.  The court also entered judgment for the net proceeds from the sale of the two properties, totaling $865,938.95 which is being held in the court's registry, and  imposed a constructive trust on those funds.  We agree with the bankruptcy court that judgment should be entered against defendants Schropp, Dahlke, and Phoenix Properties for the $146,862.35 surplus funds which should have been paid by Phoenix Properties at the foreclosure sale. We also agree that judgment should be entered against defendants Schropp and Dahlke for the $86,581.32 net cash flow received by the debtors-in-possession prior to the foreclosure sale. However, contrary to the bankruptcy court, we conclude that those funds are owed regardless of whether the defendants satisfy the rest of the judgment.

        As to the net sales proceeds received by Phoenix Properties, and held in the court registry, the court imposed a constructive trust.  "The imposition of a constructive trust is an equitable remedy which the court has the discretion to grant or deny . . .  and may be appropriate if it would be sufficient under applicable state law."[32]   Under Nebraska law, a constructive trust is a relationship, with respect to property, subjecting the person who holds title to the property to an equitable duty to convey it to another on the ground that his or her acquisition or retention of the

_____

[32] *In re MJK Clearing, Inc.*, 286 B.R. 862, 879-880 (Bankr. D. Minn. 2002); *see also N.S. Garrott & Sons v. Union Planters Nat'l Bank*, 772 F.2d 462, 466 (8th Cir. 1985) (stating that imposition of a constructive trust is appropriate only where it would be applicable under state law).

21

property would constitute unjust enrichment.[33]  To establish a constructive trust, the court must find by clear and convincing evidence that legal title was obtained by fraud, misrepresentation, or an abuse of an influential or confidential relationship, and that, under the circumstances, the party holding legal title is not equitably entitled to hold and enjoy the property.[34]

The Defendants assert that imposition of a constructive trust is not appropriate because they incurred debt to acquire the properties.  They operated the buildings for three years, made tenant improvements, worked to increase tenant occupancy, paid special assessments, and paid down debt on the buildings. They argue that the commercial real estate market improved over the three years that Phoenix Properties held title, and that the Debtors and their creditors  should not benefit from that. The measure of damages, they argue, should be the difference between the fair value of the property at the time of the foreclosure sale, and the amount they paid.  And, citing *In re BFP Resolution Trust Corp.*,[35] they argue that reasonably equivalent value, for foreclosed property, is the price received at the foreclosure sale, so long as the requirements of the state's foreclosure law were complied with. Therefore, they argue, even if they acted improperly in acquiring the properties, they should be permitted to retain the profits they realized from owning them.

The problem with the Defendants' argument is that it ignores the nature of the Trustee's action against them. The foreclosure sale was not inevitable; indeed, Chapter 11 is there to allow companies whose assets have equity to attempt to preserve such equity for the benefit of their creditors. Upon filing the case, and choosing to act as debtors-in-possession, Schropp and Dahlke were obligated to attempt to do just that.

---

[33] *Anderson v. Bellino*, 658 N.W.2d 645, 658 (Neb. 2003).

[34] *Balfany v. Balfany*, 476 N.W.2d 681, 684 (Neb. 1991); *In re Rine & Rine Auctioneers, Inc.*, 74 F.3d 848, 853-54 (8th Cir. 1996).

[35]  511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

22

Had they acted to obtain financing for the debtors-in-possession, instead of for themselves, the estate and its creditors could have received the benefit of any rising market.

> The cases which have addressed the problem of sale or misuse of estate property by a fiduciary or his delegate have either voided the transaction, . . . assessed the trustee with the measure of profit enjoyed by his delegate, regardless of whether the trustee shared in that profit personally, or assessed the trustee with the amount of diminution of the estate.[36]

As to the argument that the Defendants spent money for debt service, special assessments, tenant improvements and the like, the evidence shows that the properties were self-sustaining. There is no evidence that Schropp and Dahlke needed to subsidize the properties in order to pay those expenses. As to the argument that they took a risk in buying the properties, and should be rewarded for doing so, they took no such risk. At the time of the bankruptcy filing, Schropp and Dahlke were personally liable for the bank debt due on the properties. They themselves admitted at trial that the actions they took in the bankruptcy case were intended to protect them from personal liability on such obligations. In personally guaranteeing the new debt to Great Western they took no risk; all they did was to substitute one guarantee for another. The Trustee proved, by clear and convincing evidence, that Schropp and Dahlke were in a position to purchase the property at the foreclosure sale only because they both breached their fiduciary duties to the debtors-in-possession, and fraudulently misrepresented such purchase to the court. Therefore, the bankruptcy court appropriately imposed a constructive trust on the net proceeds received from the later sale of such property.

---

[36] *In re Lowry Graphics, Inc.*, 86 B.R. at 81 (citing *Mosser v. Darrow*, 341 U.S. 267, 273, 71 S.Ct. 680, 683, 95 L.Ed. 927 (1951); additional citations omitted).

Similarly, the net cash flow received by Phoenix Properties, after the foreclosure sale, should also have been earned for the benefit of creditors, not for Schropp and Dahlke. That amount is $375,605.05. The bankruptcy court declined to award such damages, finding that the Trustee failed to prove either that such profits were paid to Schropp and Dahlke, or that they were not used to make tenant improvements. We find that conclusion to be clearly erroneous. The evidence shows the amount of net cash flow left after payment of operating expenses. If Schropp and Dahlke had evidence of other expenses, or other uses of the resulting funds, the burden was on them to offer such evidence, and to account for the use of such funds. This they failed to do.

## CONCLUSION

The judgment of the bankruptcy court is affirmed in part, and reversed in part. The case is remanded to the bankruptcy court for entry of judgment as follows:

1. In favor of the Trustee, and against Defendants Phoenix Properties, LLC, Robert C. Schropp, and Leo E. Dahlke, in the amount of $146,862.35, representing the excess sale proceeds realized at the foreclosure sale held on or about September 24, 2002. Upon payment of such funds, the bankruptcy court should determine whether there are any valid liens against such funds, and if so, the treatment to be accorded such liens under applicable law; and

2. In favor of the Trustee, and against Defendants Robert C. Schropp, and Leo E. Dahlke, in the amount of $86,581.32, representing the net profits generated by the Debtors while operating as debtors-in-possession; and

3. In favor of the Trustee and against Defendants Robert C. Schropp, Leo E. Dahlke, Phoenix Properties, LLC, Phoenix Properties of Brook Valley 1, LLC, and Phoenix Properties of Brook Valley 2, LLC, imposing a constructive trust on funds held in the court registry in the amount of

24

$865,938.95, plus interest which has accrued on such funds while in the court registry, less any expenses payable to the court registry; and

4. In favor of the Trustee and against Defendants Robert C. Schropp, Leo E. Dahlke, Phoenix Properties, LLC, Phoenix Properties of Brook Valley 1, LLC, and Phoenix Properties of Brook Valley 2, LLC, in the amount of $375,605.05, representing the net profits generated by the properties from September 24, 2002, until the sale of the properties by Phoenix Properties in 2005; and

5. In all other respects, in favor of the Defendants.

_____